Susan A. ARMOUR, Individually and as Executrix of the Estate of Roger A. Armour, Deceased, Plaintiff,

v.

Ruth A. GRADLER, Administratrix, C.T.A. of the Estate of Donald L. Gradler, Deceased, and Ruth A. Gradler, Individually, Defendant.

Civ. A. No. 75–147 Erie.

United States District Court,
W. D. Pennsylvania.

April 10, 1978.

As Amended April 15, 1978.

James D. McDonald, Jr., Erie, Pa., for plaintiff.

John M. Wolford, Erie, Pa., for defendant.

## OPINION

WEBER, District Judge.

The present action, tried non-jury before this Court, is one for damages for the personal injuries and death of Roger A. Armour brought pursuant to the Pennsylvania Wrongful Death and Survival Acts, 12 P.S. §§ 1601–1603 and 20 P.S. § 3373, and the General Maritime Law. Originally brought in state court, this action was removed by defendant who alleged jurisdiction of the cause as one in admiralty under the General Maritime Law and under the Jones Act, 46 U.S.C. § 688. Defendant also alleged the action removable by virtue of diversity of citizenship. Liability was originally premised under common law negligence, violation of the Pennsylvania Motor Boat Law, 55 P.S. § 483, et seq., and the federal Boat Safety Act, 46 U.S.C. § 1451 et seq., the Jones Act, 46 U.S.C. § 688, and the General Maritime Law. Prior to trial of the action, plaintiff abandoned her claim based on the Jones Act.

On September 9, 1972, at approximately 8 p. m., Donald L. Gradler and Roger A. Armour left the Presque Isle Marina, Erie, Pennsylvania, in Gradler's boat, the KAMAI, a 1967—30 foot Revelcraft Express Cruiser, equipped with ship-to-shore radio. At the time of departure, Gradler was operating the boat with Armour as passenger. Their families had been advised that they were going fishing in Lake Erie and that they would return by midnight. Presque Isle Marina is a sheltered lagoon from which one enters Presque Isle Bay and thereafter into the open waters of Lake Erie.

At 1:35 a. m., September 10, 1972, Mrs. Gradler called the Coast Guard and asked them to check on the whereabouts of her husband. The Station tried calling the KAMAI by radio while a Coast Guard shore patrol was discharged to check and see if the vessel had returned to its moorings. The search continued at all harbor docks and lagoons of the Presque Isle Bay area with negative results. At this time the search expanded with a Coast Guard cutter going out on an easterly patrol from the port of Erie into Lake Erie.

At 7:25 a. m., on September 10, the Coast Guard patrol spotted the KAMAI submerged with just her cabin top visible above water and no one on board. At 12:45 p. m., two dead bodies were found floating within 100 feet of each other, later identified as Armour and Gradler. Both men were properly clad in Coast Guard approved life vests and floating in almost vertical positions. The bodies were a considerable distance from the partially submerged KAMAI. It was later determined that both men suffered from exposure prior to death and died as a result of asphyxiation.

After the KAMAI was found, the Coast Guard cutter towed the partially submerged boat and beached it in the area of the Coast Guard station. Ultimately the boat was dry-docked in the Bayfront area at Erie, Pennsylvania. After recovery the examination by the United States Coast Guard revealed that the KAMAI's one-half

inch plywood hull was split and set in on the bottom under the floor boards of the main cabin, eight feet aft of the bow and eighteen inches to the starboard side of the keel. At the time the KAMAI was located by the Coast Guard on Sunday, September 10, 1972, it was found in open water and there was no indication as to what, if any, obstacle may have been encountered.

Plaintiff claims defendant's decedent was negligent under common law principles, in attempting to set out in obviously rough seas in a vessel with substantial hull deficiencies thereby endangering the lives of those on board. Plaintiff claims that this action breaches Gradler's duty of reasonable care owed to those coming aboard the KAMAI. It is clear from the evidence at trial that Gradler was aware of the rough sea conditions existing on Lake Erie since warned several times prior to departure of the conditions by owners of larger craft.

■ The governing law of this case is found in the federal maritime law. In *Kermarec v. Compagnie Generale*, 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550 [1959] where plaintiff was injured while visiting a seaman on board a vessel berthed at a pier in New York Harbor, the Supreme Court held that the district court erred in applying New York substantive law where the petitioner was injured aboard a ship upon navigable waters. The Court held the cause to be governed by standards of maritime law even though jurisdiction was originally premised on diversity grounds. *See also Pope & Talbot v. Hawn*, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 [1953]. As in *Kermarec*, the injuries and death of Armour occurred aboard a vessel upon navigable waters. It was there the conduct of which plaintiff complains took place. Therefore, the legal rights and liabilities arising from that conduct are within the full reach of admiralty jurisdiction and measureable by standards of maritime law. "If this action had been brought in state court, reference to admiralty law would have been necessary to determine the rights and liabilities of the parties." *Kermarec*, 358 U.S. at p. 628, 79 S.Ct. at p. 408; *Branch v. Schumann*, 445

F.2d 175 [5th Cir. 1971]; *King v. Alaska Steamship Co.*, 431 F.2d 994 [9th Cir. 1970]. The law of admiralty also extends to the cause even though it involves the operation of small private pleasure craft engaged in noncommercial navigation on navigable waters. *Kelly v. United States*, 531 F.2d 1144 [2d Cir. 1976]; *St. Hilaire Moye v. Henderson*, 496 F.2d 973 [4th Cir. 1973], cert. denied *Henderson v. Moye*, 419 U.S. 884, 95 S.Ct. 151, 42 L.Ed.2d 125 [1974]. Once admiralty jurisdiction established then all the substantive rules and precepts peculiar to the law of the sea become applicable and therefore plaintiff's cause will be determined under principles of maritime negligence rather than common law negligence.

■ Another basis of liability asserted by the plaintiff is the claim for damages due to Gradler's breach of the warranty of seaworthiness. The admiralty law extends the absolute right of a seaworthy vessel to a member of a ship's company or someone aboard performing the ship's work. *Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 [1946]; *Kermarec v. Campagnie Generale*, 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550 [1959].

■ In essence, the seaworthiness doctrine requires that things about the vessel, whether the hull, the decks, or the machinery, must be reasonably fit for the purpose for which they are used. *Gutierrez v. Waterman S.S. Corp.*, 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297 [1963]. To establish the "tort" of unseaworthiness it must be shown that the work performed by the person claiming liability under the doctrine was "in the ship's service" and that the warranty of seaworthiness thereby extends to him, *Gutierrez*, supra, and that the complainant was injured by an item of the ship's equipment not reasonably fit for its intended use. *Gebhard v. S.S. Hawaiian Legislator*, 425 F.2d 1303 [9th Cir. 1970].

■ The basis of the *Kermarec* decision is that the vessel owner owes a duty of due care, not of seaworthiness, to those aboard with the owner's consent who are not in the privileged "seamen" class. In

that case, it was also determined that the admiralty law would not differentiate between licensees and invitees.

■ The "status" or relation which determines whether one is "in the ship's service" can arise only where the individual seeking to invoke liability for unseaworthiness is engaged in ". . . the 'type of work' traditionally done by seamen, and were thus related to the ship in the same way as seamen 'who had been or who were about to go on a voyage', . . ." *United New York and New Jersey Sandy Hook Pilot's Ass'n. v. Halecki*, 358 U.S. 613, 617, 79 S.Ct. 517, 519, 3 L.Ed.2d 541 [1959].

During the trial of the within action, no evidence was introduced describing the function Armour played pertaining to the voyage of the KAMAI on September 10, 1972. Aside from allegations of the intentional scuttling of the KAMAI, the evidence clearly shows that Armour and Gradler left Presque Isle Marina with the sole intent of fishing in Lake Erie. Mrs. Gradler testified that this was the intent of her husband as expressed to her several times that last morning and afternoon. Mrs. Flickenger, owner of a boat berthed close to Gradler at the Presque Isle Marina, also testified that Gradler had *inter alia* told her he intended to go out fishing that night. Thus, testimony at trial could not qualify Armour as one employed in the ship's service or performing ship's work.

Our research reveals no case in which a passenger on board a pleasure craft for recreational purposes only and not for hire based an action for damages against the owner of the craft on the seaworthiness doctrine unless "seaman" status was first established. Such a status was established for a member of the voluntary crew of a pleasure yacht where every crew member performed duties in connection with the vessel under the direction of its skipper. *In re Read's Petition*, 224 F.Supp. 241 [S.D.Fla. 1963].

■ Plaintiff was not aboard the KAMAI to perform the traditional duties assigned to one in the ship's employ. Armour and Gradler intended to go fishing and any assistance rendered by Armour was voluntary and not under orders in the sense of a traditional master/crew arrangement. No evidence was presented that the craft required two people for safe operation, nor that a substantial part of Armour's role on the boat was to aid in navigation of the craft. The only evidence produced at trial with respect to the actual operation of the KAMAI consisted of eyewitness testimony placing Gradler at the helm and in control of the KAMAI while it left the Presque Isle Marina. Admittedly, the boat must be managed, and guests, if familiar with the handling of boats (as Armour was, being a small pleasure boat owner himself), aid in the mooring, anchoring and casting off of the vessel. Armour was a guest or acquaintance aboard Gradler's boat and a companion on a fishing outing. Armour did not come aboard for the purpose of aiding in navigation of the vessel or performance of crewman duties. The KAMAI was a privately owned pleasure craft and used exclusively as such. Gradler wanted to go fishing and invited Armour to come along as a guest, possibly to assist in handling of the boat in a joint venture. Assigning Armour the status of a seaman in the sense it is used in applying the seaworthiness doctrine would be improper under these circumstances; the necessary status for the seaworthiness doctrine was not intended to include two friends fishing for recreational purposes.

■ A boat owner's liability for unseaworthiness "is a form of absolute duty owing to all within the humanitarian range of its humanitarian policy." *Sieracki*, 385 U.S. p. 95, 66 S.Ct. p. 877. That policy would include owner liability to one performing a service to the ship whether as a member of the crew or as an intermediary employed to do the work of a crewmember. However, where the injured party is a guest or co-adventurer, the policy and the historical function of the seaworthiness doctrine will not support unseaworthiness liability.

Plaintiff also claims damages under the general maritime law resulting from the negligence of the defendant.

Plaintiff claims that the unreasonable risk created by Gradler, included among other things, the operation of the KAMAI when weather and sea conditions were such that venturing onto the lake with knowledge of an unseaworthy condition gravely endangered the lives of those on board.[1]

There was evidence that Gradler knew the KAMAI to be dangerous in rough water due to hull structure deficiencies. Gradler was repeatedly warned of the rough seas prior to leaving the Marina but nevertheless went into the lake where the hull split and took on excessive water, causing the foundering of the KAMAI.

Plaintiff's lead expert, Raymond A. Yagle, Ph.D., professor of Naval Architecture at the University of Michigan, evaluated the seaworthiness of the KAMAI and its propensity for impact damage under conditions one might encounter on Lake Erie. As noted above, the KAMAI was a 30 foot cruiser with ½ inch marine plywood sheathing in the hull section and was of a keel-type structure along the center line of the boat with longitudinal girders approximately 18 inches to either side of the keel with strong backs connecting the keel to the two longitudinals. These strong backs were transverse members and also 18 inches apart and not in contact with the plywood sheathing. This construction allowed a lateral dimension of approximately 15 inches of unsupported plywood with a longitudinal expanse of between 8 to 10 feet. Dr. Yagle found this construction in relation to the ½ inch plywood hull weak and inadequate for the intended use of the boat.

In this area of the hull the only contact of the KAMAI's framing with the plywood sheathing was at the keel and the longitudinals on each side. The resulting effect of a plywood bottom being unsupported over such a length and width is that the rigidity of the plywood lessens. The boat is subjected to large pressure loads and the absence of framing allows the hull to be freely displaced. Yagle testified that this displacement is called "panting" or "flexing" and causes deterioration of the plywood at an accelerated rate, gradually delaminating the plywood making it difficult to maintain as well as being unsafe.

Yagle found the design unusual in the sense that typical boat design implemented two considerations: (1) provision of a skeleton which supports the sheathing and (2) integration of the sheathing into the frame system so the two work together. The design of the KAMAI did not meet this standard. The unsupported panel, due to lack of contact between framing and sheathing, did nothing to reduce the panting of the sheathing due to hydrostatic pressures both at rest in still water and underway at high speeds with rough seas and continuous flexing of the wood. The plywood first deteriorates internally and the laminae separate. While testimony established that one-half inch plywood was equal in strength to thicker planking, this is true only as long as its lamination is intact. The lack of proper structure which caused this led Yagle to his conclusion that the hole in the KAMAI was due to its deficient structure. However, Yagle did testify that the sheathing is so weakened in this type of construction over a period of time that a less severe loading condition is apt to cause failure. Therefore, the boat will not perform as a reasonably prudent boat operator would expect it to. Yagle concluded that the damage was caused by an outside object striking the weakened hull sheathing, causing a puncture. A strong hull is more capable of resisting an outside object such as a log, causing it to roll underneath the vessel without penetration.[2] Yagle's opinion is

1. Plaintiff claims that the aforesaid negligent operation of the KAMAI resulted in the violation of 55 P.S. § 485g.2(a) of the Pennsylvania Motor Boat Law and of the federal Boat Safety Act, 46 U.S.C. 1461(d) and therefore the burden of proof shifts to the defendant to prove that violation of the statute could not have caused

the death of the plaintiff. *The Pennsylvania*, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148 [1873] and *Skidmore v. Gueninger*, 506 F.2d 716 [5th Cir. 1975]. This is a heavy burden.

2. Testimony was offered by plaintiff at trial which indicated the possibility of an intentional foundering of the KAMAI by Gradler.

supported by Gradler's own comments about the condition of his boat.

Defendant's expert, Alanson Mang, ship's carpenter, disagreed with plaintiff's expert with respect to the effect of excessive flexing. Mang found no unseaworthy condition due to the longitudinal construction of the KAMAI nor upon visual examination of the craft on the eve of trial.[3] Mang agreed that the unsupported area of the hull would have been stronger if the floor timbers (transverse members) met the bottom but that the hull was not weakened to the point of being unseaworthy as a result of the absence of support. Mang testified that a degree of flexing is beneficial and that excessive flexing does not cause lamination failure. According to Mang, when the laminae fail, a variation in the thickness of the plywood results and this variation in thickness was not noticeable upon visual exam at the time of trial. Mang also used a screwdriver to tap on the hull in order to determine whether or not the plywood hull had deteriorated to the point of being classified as unseaworthy. Mang concluded that the plywood hull of the vessel at the time he examined it was sturdy and sound.

We think the KAMAI was in an unseaworthy condition at the time Gradler departed from Presque Isle Marina on the night of September 9, 1972. A degree of flexing in the plywood hull is expected and even necessary in adding to the strength of the hull, however, the large expanse of unsupported plywood sheathing composing the hull of the KAMAI was subjected to excessive flexing due to its deficient hull construction which could only result in the breakdown or deterioration of the plywood.[4] This deterioration leads to a weakening of the hull when it comes in contact with objects found in the water, floating or submerged. Therefore, the vessel becomes unsafe when exposed to seas similar to those existing on Lake Erie at the time the KAMAI was holed, where floating debris is most prevalent, and objects are less visible.

As noted earlier, a finding of unseaworthiness alone, as the cause of the KAMAI's foundering, would not result in liability on the part of Gradler. The only existing claim in the present action is one for maritime negligence and therefore an examination of the duty Gradler owed Armour is necessary.

Gradler owed Armour a duty of reasonable care. That duty was set forth by the Supreme Court in *Kermarec v. Compagnie*, 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550 [1959]:

"We hold that the owner of a ship in navigable waters owes to all who are on board for purposes not inimical to his

On the eve of the mishap, during a conversation with Mrs. Clarence Flickinger at the Presque Isle Marina, Gradler told Flickinger that he intended to sink his boat and asked Flickinger to remain at her ship-to-shore radio and listen for a distress call. Mrs. Flickinger testified that no mayday signal was received on the night of September 9, and that when Gradler left the Flickinger boat earlier in the evening, she felt that he had changed his mind about sinking the KAMAI. Mrs. Flickinger also testified that Gradler had made this comment about sinking his boat on prior occasions but had never requested that she leave her radio on. Roger Armour was not present during this conversation.

While we do not doubt that Gradler made these comments about sinking the KAMAI to Mrs. Flickinger, we do not think the evidence supports a finding that Gradler intentionally sunk the KAMAI. Gradler had made similar remarks on other occasions. The cause of the remarks apparently arose from Gradler's

dissatisfaction with the KAMAI and were probably made in frustration more than anything else. The fact that no distress call was received by Flickinger supports this conclusion.

3. The KAMAI was subsequently salvaged and reconditioned over a two year period by Daniel J. Michaels. Michaels sold the craft to the present owner, Richard Himes, and it was in dry dock at the time of trial. The KAMAI had been used without incident on weekends (weather permitting) by Himes from July to October 1976.

4. This conclusion is based upon reliance on plaintiff's expert witness's testimony. This testimony was not based upon an internal examination of the plywood sheathing used on the KAMAI's hull because no sample piece was available for testing. The expert relied *inter alia*, upon visual examination of the reconditioned KAMAI, four years after the accident.

legitimate interests the duty of exercising reasonable care under the circumstances of each case." 358 U.S. at 632, 79 S.Ct. at 410.

Gradler was aware of the rough seas on Lake Erie on the day of the accident. He postponed the fishing trip he planned for the morning of September 9 due to heavy winds. Later in the afternoon he decided to go out because he thought the winds had died down. Upon reaching the marina, several people who had been on the lake warned him of the rough seas they had experienced. These people had boats larger than Gradler but still opted to stay in protected areas rather than venture onto the rough Lake.

Gradler was also aware of the hull deficiencies of the KAMAI. In September of 1971, the KAMAI took on excessive amounts of water while docked at the Presque Isle Marina and partially sank. The cause of the leak was apparently the KAMAI coming down on a log on her port side while in rough waters, as reported by Gradler in his insurance claim.

Gradler was an experienced carpenter and a building contractor by trade. On several occasions between the time the KAMAI developed leaks in September of 1971 and her sinking on September 9 or 10, 1972, Gradler examined the framing in the hull bottom with Clarence Flickinger, also an experienced boater and carpenter. Gradler and Flickinger discussed the need for additional hull strength through application of framing or ribs to prevent the plywood hull from flexing or warping in rough water. Gradler expressed concern to Flickinger about the bottom "opening up, if the sea was a little rough, and sinking the boat." (TT 143). In his conversations with Mrs. Flickinger prior to leaving the marina on the eve of the mishap, and at other times, Gradler discussed the unseaworthiness of the craft and its susceptibility to damage, especially in rough water. (TT 128–130.)

Gradler also was aware that debris was frequently encountered in Lake Erie waters especially in a rough sea. His encounter with a log in rough water caused the September 1971, sinking. Mrs. Gradler also testified that they frequently encountered debris in the lake. (TT 185).

■ In light of the above considerations, Gradler's actions breached his duty of reasonable care which was owed to Armour. Gradler was aware of the frailities of the KAMAI and therefore venturing out into the lake under the conditions described created an unreasonable risk of harm to Armour, constituting actionable negligence on the part of Gradler.

## LIMITATION OF LIABILITY

In the Answer to Plaintiff's Complaint, defendant raises the Limitation of Liability Act, 46 U.S.C. § 183, in defense of any claim for damages in the event liability is determined against the defendant. § 183(a) provides that:

"The liability of the owner of any vessel, whether American or foreign, . . . for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall not, . . ., exceed the amount or value of the interest of such owner in such vessel, and her freight then pending."

Plaintiff challenges the applicability of the Limitation Act under the present circumstances since a pleasure craft was involved in this mishap and not a commercial vessel. Plaintiff contends that § 183(a) was not intended by Congress to apply to an owner of a pleasure craft because to do so would protect owners of boats used for pleasure rather than commerce contrary to the intent of the Act and that the owner of an inexpensive pleasure craft ought not to be able to limit his liability to a nominal sum where loss of life is concerned.

■ As applied, the value of the owner's interest in the vessel for purposes of the Limitation Act, is taken as of the termination of the voyage in which the damage was incurred, regardless of the condition of the vessel. Because of this rule, where a vessel is a total loss in commercial value the limi-

tation of liability is equivalent to extinguishment of liability.[5]

We agree that the Limitation Act should not apply in circumstances such as these were a vessel is used purely for pleasure. The statutory purpose of encouraging shipbuilding and the employment of ships in commerce should not be extended so as to permit the owner of a small pleasure cruiser or motorboat to escape liability.

Our sentiments with respect to this matter were expressed by the Fourth Circuit Court of Appeals through dicta in *Richards v. Blake Builders Supply, Inc.*, 528 F.2d 745 [4th Cir. 1975]. In *Richards* the Court dismissed actions for damages brought by several passengers injured aboard a small pleasure craft for lack of jurisdiction. In dismissing the actions, the court commented on why various facets of the maritime law should not be applied to the operation of a small pleasure craft.

Surely, the limitation of liability to the value of the boat of an owner without 'privity or knowledge' of the fault in the context of a small pleasure craft capable of causing death or grievous injury is in conflict with our senses of justice and appropriateness. It may have been necessary to provide an owner of a commercial vessel with the right to limit his liability to the after event value of the vessel; American shipping was in competition with English shipping where there was such a right, and members of the industry may have been thought in need of protection from exposure to all of the economic consequences of major disasters. But we can perceive no reason to extend that protection to the relatively affluent owners of pleasure boats and their insurers at the expense of those injured or killed and their families. · 528 F.2d at 748.

However, no reported case in recent time has denied limitation of liability under the Act for the reason that the vessel was a pleasure craft and therefore not within the scope of § 183(a). In fact when the question has squarely arisen, courts have applied the Limitation Act to the operation of pleasure craft on navigable rivers. *Feige v. Hurley*, 89 F.2d 575 [6th Cir. 1937]; *Petition of Porter*, 272 F.Supp. 282 [S.D.Tex.1967]; *Petition of Klarman*, 295 F.Supp. 1021 [Conn.1968]; *Application of Theisen*, 349 F.Supp. 737 [E.D.N.Y.1972]; *Complaint of Rowley*, 425 F.Supp. 116 [D.Idaho 1977].

We find that the owner of a small pleasure craft may invoke § 183 of the Limitation of Liability Act to limit his liability even though the craft is not used for commercial purposes, but we find it inapplicable in the present case.

Before § 183(a) is applied to limit liability in a given situation, it must be determined that (1) the party seeking to limit liability to its interest in the vessel must be an owner of the vessel, and that (2) the owner of the vessel is without privity or knowledge of the occasion for injury aboard the vessel. *Coryell v. Phipps*, 317 U.S. 406, 63 S.Ct. 291, 87 L.Ed. 363 [1943]. We have already determined that Donald Gradler had knowledge of the dangerous condition and deficiencies in the KAMAI's hull which led to its foundering and the subsequent drowning of its passengers. Therefore, by its terms, the Limitation Act cannot limit any damages recoverable by the plaintiff from Gradler's estate.

Plaintiff also asserts liability for the death of her decedent against Ruth A. Gradler, wife of Donald Gradler and co-owner of the KAMAI. Ruth A. Gradler seeks to limit her liability through application of § 183. Plaintiff contests the application of the Act claiming that the negligence of Donald Gradler is imputed to his wife as co-owner.

We find no reason to consider whether Mrs. Gradler may as co-owner of the KAMAI reap the benefits of the Limitation Act. A discussion of the imputation of a co-owner's negligence would be relevant if a viable claim remained under the Jones Act or under the seaworthiness doc-

---

**5.** This is the case with respect to the KAMAI and its owners since applying the Act in this instance would limit the defendant's liability to only $770.00, the KAMAI's salvage value.

trine. However, the mere maritime negligence of Donald Gradler cannot be imputed to his wife simply because she is a co-owner. Nor has plaintiff made any independent claim of negligence against Mrs. Gradler. Mrs. Gradler was not on board the KAMAI at the time of the mishap. Testimony at trial showed that she had no knowledge of any existing hull deficiencies which made the KAMAI unfit for its intended use. Having concluded that Mrs. Gradler is free from any liability for the injuries and death of Roger Armour, she has no need to employ § 183.

## FINDINGS OF FACT

1. On Saturday evening, September 9, 1972, at approximately 8 p. m., Donald Gradler and Roger Armour left the Presque Isle Marina, Erie, Pennsylvania, in Gradler's boat the KAMAI, with Gradler operating the boat and Armour as passenger. Their families had been advised that they were going fishing and that they would return by midnight.

2. At the time the KAMAI left the marina and proceeded onto the lake, small craft warnings were displayed at the Erie Coast Guard Station which must be passed enroute to the lake. The weather was clear; however seas were reported at three to four feet by the Coast Guard. Gradler enjoyed rough water boating and frequently exposed the KAMAI to rough seas.

3. At 12:45 p. m., September 10, 1972, the bodies of Armour and Gradler were found dead, floating in life jackets, a considerable distance from the foundering KAMAI At the time of discovering the KAMAI there was no indication as to what, if any, obstacle may have been encountered.

4. While the Coast Guard removed a section of the plywood sheathing in the damaged area, no report is available with respect to an evaluation or inspection of the KAMAI's hull as of the time of its foundering.

5. At the time the boat was discovered foundering in Lake Erie, the floor boards (or cabin sole) were in place and undisturbed. The Coast Guard removed the cabin sole to expose the site of the leak.

6. The KAMAI's plywood bottom was splintered as a result of impact with a floating or submerged object in the lake. The impact occurred within the area lacking transverse support to the ½ inch plywood bottom.

7. Many loosened screws were located in the area of the hole in the KAMAI's bottom, as well as in her port side (See Coast Guard report and Ex. 19). These screws fastened the hull's ½ inch plywood sheathing to the framing. The heads were damaged or pulled through the half inch plywood. Some screws were pulled from the framing and hull at various distances. Any inference from this condition is impossible since several plausible explanations exist as to their cause, i. e. the effect of towing and/or beaching a partially submerged boat, effect of temporarily patching the boat from the inside, and the possibility of other impact forces applied from inside the hull.

8. On two occasions prior to September 10, 1972, the KAMAI leaked and took on water while docked at the Presque Isle Marina. One of these occasions, during the week of September 5, 1971, the leak resulted from damage to the port side of the hull sustained upon impact by the KAMAI with a log in fairly rough water. This hole was repaired by an experienced yacht builder and repairer. At the time of these repairs Donald Gradler was concerned about the construction of the hull and apparently was satisfied with the repair work that was completed even though the work did not include the addition of any transverse support to the hull.

9. Donald L. Gradler, an experienced carpenter, and Clarence Flickinger, also an experienced carpenter, examined the KAMAI's framing in the hull on two or three occasions between the time the boat developed leaks in September of 1971 until she sank on September 9 or 10, 1972.

10. Gradler was aware that the only hull support to the plywood bottom ran longitudinally between the bottom without transverse support in panels approximately 15 inches by eight to 10 feet, on both starboard

and port sides of the keel. Gradler recognized and discussed with Flickinger the need for transverse support in this area and expressed concern that the bottom might open up "if the sea was a little rough." (TT 143).

11. After the repairs in 1971 Gradler was concerned with respect to the construction of the KAMAI's hull. The repairs did not include the addition of transverse framing but were exterior strips, described as spoilers or anti-roll keels, and provided additional longitudinal support.

12. Upon leaving Presque Isle Marina on September 9, 1972, Gradler was aware that no additional transverse support had been added to the hull of the KAMAI.

13. Gradler was aware that partially submerged debris, including logs, are encountered in Lake Erie and are most difficult to see when underway at night.

14. The absence of additional transverse support in the hull permitted the unsupported panels to flex under ordinary, foreseeable loading conditions.

15. Flexing of plywood panels in use tends to weaken the structural integrity of the laminae within the plywood at an accelerated pace, even though some degree of flex is not harmful and in fact may enhance hull strength.

16. The unsupported plywood panels, in this instance, rendered the hull more susceptible to impact damage and therefore made the KAMAI dangerous for use in relatively rough waters of Lake Erie.

17. Donald Gradler was aware of this danger on September 9, 1972.

18. Shortly before leaving the Presque Isle Marina on September 9, 1972, Donald Gradler was warned of the weather and rough sea conditions in Lake Erie by Alfred Henry, Margaret Flickinger and David Maille, and the Coast Guard small boat warning flag.

19. Shortly before leaving the marina on September 9, 1972, Donald L. Gradler acknowledged to Margaret Flickinger that the KAMAI was unseaworthy and expressed the intention of sinking it that evening in Lake Erie waters.

20. Roger A. Armour was not present during Gradler's conversation with Alfred Henry or his conversation with Margaret Flickinger prior to leaving the marina. There is no evidence that Armour was present at the time of the conversation at the marina between David Maille and Gradler.

21. This same vessel, with repairs to the hull damage due to the events of September 9 or 10, 1972, but without change in structural integrity, has been out on Lake Erie frequently since the accident, including lake crossings, in storms and rough water, with no apparent problem with hull or leakage.

22. Roger Armour was not an inexperienced boater, as he owned a small boat, had been out on Lake Erie in this boat, and participated in the decision to go out fishing on the night of this tragedy.

23. There is no evidence of any actual knowledge or privity of any dangerous condition of this vessel by Ruth Gradler, nor was she on board at the time of this event.

24. Donald Gradler was not negligent in merely venturing out into the rough lake waters, however, the conduct of Donald Gradler was negligent in operating the KAMAI with knowledge of rough weather and sea conditions, knowledge of the weakness in the hull and knowledge that partially submerged objects are encountered in the Lake waters.

25. The hull of the KAMAI at the time of the mishap was punctured and fractured from a combination of factors, i. e. a collision with an unidentified object, operating in rough waters and the weak hull with its deficient construction and design.

26. Although a properly framed and supported hull could still be fractured by impact with a massive object, the hull deficiencies in the KAMAI affected and would affect the severity of the resulting damage.

27. The defect in the hull, namely the lack of sufficient transverse support to the plywood sheathing in the hull, was a substantial, contributing factor to the resulting foundering and holing.

28. The negligent conduct of Donald Gradler proximately caused the injuries and death of Roger A. Armour.

## CONCLUSIONS OF LAW

1. Donald Gradler was negligent in the operation of the KAMAI.

2. Donald Gradler's negligence was the proximate cause of the death of Roger Armour.

3. Roger Armour was not guilty of any negligence which was the cause of his death.

4. Donald L. Gradler, co-owner and operator of the KAMAI at the time of the mishap, had knowledge and privity of the acts causing the death of Roger A. Armour, therefore his personal representative is not entitled to limitation of liability pursuant to 46 U.S.C. § 183.

5. Donald L. Gradler operated his vessel in a negligent manner thereby violating the Federal Boat Safety Act of 1971, 46 U.S.C. § 1461(d).

6. Susan A. Armour, individually and as Executrix of the Estate of Roger A. Armour, deceased, is entitled to judgment against Ruth A. Gradler, Administratrix of the Estate of Donald A. Gradler, deceased.

## DAMAGES

### FINDINGS OF FACT

1. Roger A. Armour was born December 8, 1944, and at the time of his death on September 10, 1972, was 27 years old.

2. Roger A. Armour, at the time of his death, on September 10, 1972, was survived by his widow, Susan A. Armour, and one child, Brian James Armour, who was born June 28, 1971.

3. Roger A. Armour graduated from Erie Technical High School, Erie, Pennsylvania, and began work on March 2, 1964, for Sterling Milk Corporation when he was 19 years old. He worked for Sterling Milk Corporation continuously until his death and was superintendent of its garage facility at the time of his death.

4. Roger A. Armour's gross earnings at Sterling Milk Corporation from January 1, 1967, until the time of his death were as follows:

| | |
|---|---|
| 1967 | $6,080.00 |
| 1968 | 6,680.00 |
| 1969 | 7,195.85 |
| 1970 | 8,275.56 |
| 1971 · | · 8,613.94 |
| 1971 (Jan. 1 through Sept. 15, 1972) | $6,421.31. |

5. At the time of the death of Roger A. Armour on September 10, 1972, the rate of pay for his position was $755 per month annualized at $9,100.

6. Roger A. Armour maintained an excellent employment record at Sterling Milk Corporation and was a good, reliable and conscientious employee.

7. At the time of his death, Roger A. Armour had a life expectancy of 42.8 years and a work expectancy of 35.1 years in accordance with United States Department of Health, Education and Welfare Statistics. At the time of trial remaining work expectancy was 31 years.

8. The present value of annual future payments for each One Dollar payable each future year for 31 years, using a factor of 6% simple interest is 17.1929.

9. The following expenses have been incurred as a result of the death of Roger A. Armour:

| | |
|---|---|
| (a) Estate administration expenses and costs | $500.00 |
| Funeral arrangements | 1,814.00 |
| Cemetery lot | 95.00 |
| Memorial marker | 160.00 |
| Total | $2,569.00 |

10. The decedent performed substantial services around the family home which enabled him to make the most of his relatively modest income.

11. Roger A. Armour was in good health prior to his untimely death on September 10, 1972.

12. Roger A. Armour, and his wife and child, maintained their home at 2150 West Eaton Road, Fairview, Erie County, Pennsylvania. That property

was acquired by Roger Armour and Susan Armour, his wife, on October 26, 1967 as shown in Erie County Deed Book 971, at page 715, and thereafter a new home was constructed thereon. That property was sold on July 7, 1974 for $48,250. The equity in the home at the time of sale, over the mortgage balance and closing costs, was $23,444.01.

13. On April 14, 1967, Roger A. Armour and Susan A. Armour, his wife, acquired a rental property commonly known as 1201 West 28th Street, Erie, Pennsylvania, for $15,500. as shown in Erie County Deed Book 959 at page 7. The decedent was able to, and did, manage to substantially maintain the rental units, thereby increasing the return therefrom. Following his death, the property was sold for $24,000 on August 8, 1974. The equity in the property at the time of sale, over the mortgage balance and closing costs, was $14,129.20.

14. In May of 1972, Roger A. Armour began engaging in the sales and service of refrigeration equipment as a part time avocation in addition to his duties at Sterling Milk Corporation. Said business was operated under the fictitious name of Arctic Industries which was duly registered in the office of the Prothonotary of Erie County on May 17, 1972, as shown in Fictitious Name Docket 10, at page 289. Arctic Industries was fully sanctioned and approved by Sterling Milk, Inc., as described in Exhibit 54. No profits were generated by Arctic Industries prior to the death of Roger A. Armour.

15. We find that Roger A. Armour required 30% of his income or $2,700 for his own maintenance and support.

16. We find that Roger A. Armour contributed 60% of his income or $5,400 for the support of his wife and one child, aged one year at the time of his death.

17. We find that Roger A. Armour was accumulating an estate from his earnings at the rate of $1,000 per year by principal payments on mortgages for real estate which he and his wife had purchased.

18. We find no sufficient evidence of conscious pain and suffering.

## CONCLUSION

We find damages as follows:

Wrongful death:

| | |
|---|---:|
| Funeral and administration expenses | $ 2,569.00 |
| Loss of support and maintenance of dependents entitled to wrongful death damages | |
| From date of death to dates of trial $5,400.00 per year from 9/10/72 to 1/6/77 | 23,400.00 |
| Future loss, at $5,400.00 per year × 31 years reduced to present worth by a factor of 17.20 | 92,880.00 |
| TOTAL | $ 118,849.00 |

Survival Damages:

| | |
|---|---:|
| Accumulation of equity in property and estate, from earnings after deduction of decedent's own maintenance and support of dependents | |
| From date of death to date of trial $1,000.00 per year × 4⅓ years | $ 4,333.00 |
| Future loss, at $1,000 per year × 31 years reduced to present worth by a factor of 17.20 | 17,200.00 |
| TOTAL | $ 21,533.00 |