## FEIGE v. HURLEY.

### No. 7180.

Circuit Court of Appeals, Sixth Circuit.
April 12, 1937.

W. S. Heidenberg, of Louisville, Ky., for appellant.

R. P. Hobson, of Louisville, Ky. (Woodward, Dawson & Hobson, of Louisville, Ky., on the brief), for appellee.

Before HICKS, SIMONS, and ALLEN, Circuit Judges.

HICKS, Circuit Judge.

On July 3, 1934, about 10 p. m., Arthur Fred Feige, with three companions, was riding in a canoe on the Ohio river near Six Mile Island, when they were struck by a motor boat owned and operated by appellee, William Parker Hurley, and Feige lost his life in the collision. Berner Feige, administrator of the estate of the deceas-

ed, brought suit in the Jefferson circuit court of Kentucky against appellee to recover damages for the death of his intestate. Thereupon appellee filed a libel in the United States District Court seeking to limit his liability to the value of the motor boat under title 46, § 183, U.S.C. (46 U.S.C.A. § 183), and appellant answered and filed a cross-libel seeking damages for the death of his intestate.

Upon the hearing the court discharged appellee from appellant's claim.

■ Appellant's objection to the jurisdiction was untenable. The statute applies to "any vessel." Appellee's motor boat was a 15-foot Chris-Craft with a 70-horsepower motor, capable of going 35 miles per hour. It was within the statute. See Spencer Kellogg & Sons v. Hicks, 285 U.S. 502, 52 S.Ct. 450, 76 L.Ed. 903; The Oneida, 282 F. 238 (C.C.A. 2); Warnken v. Moody, 22 F.(2d) 960 (C.C.A. 5).

The evidence was that Feige and another young man, Virgil Fontaine, procured a canoe at a boat club on the Kentucky side of the river about 8:30 or 9 o'clock and in company with Miss Clarkson and Miss Banks paddled slowly upstream, passed the Richmond Club, then crossed the river and turned about 200 yards above the foot of Six Mile Island and were headed back downstream but diagonally toward the Louisville Boat Club on the Kentucky side. The canoe was being paddled by Feige sitting in the stern and by Miss Banks in the bow seat. Miss Clarkson was sitting near Feige and Fontaine was seated further forward. The canoe, 16 feet long, was painted an aluminum color with a black streamline along the top. The party had been singing intermittently but it is not clear whether they were singing immediately before the accident. The canoe was without a light and the weight of the evidence is that the night was dark although there was limited visibility. The sky was clear and the stars were out but the moon had not risen.

Appellee testified that earlier in the evening he had been a member of a picnic party of eight people some of whom he had taken up to Goose Island in the motor boat; that before dinner and three hours before the accident he had had two highballs but that he had had no liquor thereafter; that after the picnic he dropped two of the party at a boat club and drove back up the river with a Miss Sanders to ride the waves of the "Idlewild" which

had just passed; that they went upstream about a quarter of a mile and then over toward the Indiana shore to circle and come into his slip on the Kentucky side; that as he was driving toward the Indiana shore at not over 22 or 23 miles an hour he saw the canoe exactly ahead of the boat and not over 15 feet away; that if he had gone straight ahead he would have cut it in two at the middle; that he turned the wheel to the left, downstream, as hard as he could, slowed the motor and put it in reverse, although it was then too late to avoid striking the canoe.

Such are the outlines of the two streams of human activity which met in tragedy.

Appellee claimed to have struck the front of the canoe only with the stern of his boat but Feige in the stern of the canoe, who was an expert swimmer, was apparently badly injured, since he was seen in the water only momentarily before he went down. Miss Clarkson said that after the accident her back was "like a washboard" as though the propeller had passed over it. The other two were thrown into the water and the propeller cut a gash in both sides of the canoe about two feet from the bow. Appellee circled, threw a cushion to Fontaine, who was supporting Miss Banks, and jumped into the water but accomplished nothing toward the rescue. Miss Clarkson worked the canoe over to the boat and climbed in and the other two were rescued by the occupants of another canoe. While in the water appellee called to his companion to throw away a bottle of liquor that was in his boat.

The court found that appellee was without fault. Whether he was must be determined upon additional evidence now to be considered. His boat had a green light on the starboard and a red light on the port and a white light in front but he testified that the night was very dark; that the view in front of him was entirely blank up to the top of the trees on the Indiana shore and that the position of a boat in front could not be seen. It was the eve of the national holiday and there were many canoes on the river in the vicinity of the accident and many of them were without lights. Appellee admitted that he knew there were a good many canoes on the water but denied that he knew that any were without lights. However, he had worked in a campaign to require canoes to carry flashlights, and he must, perforce, have known of the danger of colliding with

them. There was evidence that prior to riding the waves of the Idlewild appellee had been "cutting capers" in front of a boat club on the Kentucky side; that he had been driving at high speed and turning quickly; that he "was all over the river, he was just speeding around every place"; that he had been riding in circles before starting across the river at a high rate of speed on the run that terminated in the accident.

Several witnesses testified that the high speed of the boat across the river attracted their attention. One of them stated that he "could see the light cutting across the river at a terrific rate" and that he heard the impact at an estimated distance of two city blocks.

Appellee testified that at the rate he was running the boat threw a wave on either side 3 or 3½ feet high and that the boat had a windshield to protect the front from the spray.

■ There was considerable testimony as to how far the canoe could have been seen. One witness testified that he saw the wrecked canoe at a distance of 150 feet although he was perhaps aided somewhat by the lights on Hurley's boat, which was then nearby. Another said that visibility was generally good 100 feet or more and that he saw the wrecked canoe when he was approximately 200 feet away from it. Two others testified that in their opinion the canoe could have been seen by a proper lookout at a distance of 200 or 300 feet. And still another, a fisherman, said that on a night like that a canoe could have been seen 100 yards or better. Some of appellee's witnesses testified that objects on the river were invisible unless shore lights cast a reflection, or at best, could be seen only 20 to 40 feet. Nevertheless, according to his own testimony, appellee drove his boat through the darkness at such a speed that he was unable to distinguish the canoe until he was within 10 or 15 feet of it. This was more than negligence, it showed a reckless disregard for the rights of others on the river. The Pennsylvania, 19 Wall. 125, 133, 22 L.Ed. 148; Quinette v. Bisso (C.C.A. 5) 136 F. 825, 830, 5 L.R.A.(N.S.) 303.

But it does not follow that appellee was liable.

The testimony is clear that Feige was the first occupant of the canoe to apprehend any danger. Fontaine testified that the first he knew, about two seconds be-fore the accident, Feige yelled to the approaching boat to "watch out." Miss Clarkson's first intimation was the scream from Feige. Miss Banks remembered nothing, having been rescued, unconscious, from the water.

The deceased, who was guiding the canoe, should reasonably have expected the presence of other craft upon the river and have foreseen the danger of a collision. He should therefore have exercised the utmost care. It was his duty both to look and listen and he was charged with the knowledge of what he might have discovered. The inference is that neither he nor any of the canoe party were either looking or listening. If they had looked they could have seen the lights of the approaching boat. If they had listened they could have heard the roar of its motor, which, under the evidence, was audible for at least 300 or 400 yards.

■ One of the pilot rules, U. S. Department of Commerce, requires that "rowing boats under oars shall have ready at hand a lantern showing a white light which shall be temporarily exhibited in sufficient time to prevent collision." While this rule may not be technically applicable to canoes, it does indicate a standard of care which the canoe party should have observed. The utmost that may be said is that the death of the deceased was caused by the combined and concurring negligence of both parties, and under the common law appellant must fail.

Appellant, however, insists that the common law is not applicable; that the rule in admiralty is that where both parties are in fault the damages must be divided. He cites Pfister v. Greening (The Gray Eagle), 9 Wall. (76 U.S.) 505, 19 L.Ed. 741; and Archibald M. Pentz v. The Steamer Ariadne (The Ariadne) 13 Wall.(80 U.S.) 475, 20 L.Ed. 542.

These cases are inapplicable. Both were strictly in admiralty under the maritime law. In each the controversy was over the question which colliding vessel was in fault and in each it was held that both were negligent and the damages should be divided under the admiralty rule. Somewhat closer is The Max Morris, 137 U.S. 1, 11 S.Ct. 29, 34 L.Ed. 586, where the plaintiff was injured on board a vessel partly through the negligence of its officers and partly from his own, but there the suit was in admiralty against the vessel. The damages were not divided equally but

were assessed by the District Judge according to his own view of right and justice between the parties. The case was affirmed upon its peculiar facts. The court said, 137 U.S. 1, at pages 14 and 15, 11 S.Ct. 29, 33, 34 L.Ed. 586, supra:

"As stated by the district judge in his opinion in the present case, the more equal distribution of justice, the dictates of humanity, the safety of life and limb, and the public good, will be best promoted by holding vessels liable to bear some part of the actual pecuniary loss sustained by the libelant, in a case like the present, where their fault is clear, *provided the libelant's fault, though evident, is neither willful, nor gross nor inexcusable, and where the other circumstances present a strong case for his relief. We think this rule is applicable to all like cases of marine tort, founded upon negligence, and prosecuted in admiralty,* as in harmony with the rule for the division of damages in cases of collision." (Italics ours.)

But it is settled that no suit may be brought to recover damages for death in our admiralty courts under the general maritime law. The right exists, if it exists at all, by virtue of some statute, state or federal. Here the death occurred, as admitted in the pleadings, in Kentucky, and the administrator's right to sue is based upon a Kentucky statute (Carroll's 1915, vol. 1, § 6). The action is in personam— it seeks judgment against appellee personally. Because of the statute admiralty will entertain jurisdiction. Western Fuel Co. v. Garcia, 257 U.S. 233, 240, 242, 42 S.Ct. 89, 66 L.Ed. 210; Spencer Kellogg & Sons, Inc., v. Hicks, supra, 285 U.S. 502, 513, 52 S.Ct. 450, 76 L.Ed. 903. But such right is enforced in admiralty according to the principles of the common law and contributory negligence is a complete bar to a recovery [Robinson v. Detroit & C. Steam Nav. Co., 73 F. 883, 894 (C.C.A.6); Quinette v. Bisso, supra] unless such defense to an action for wrongful death has been abolished in the state where the accident occurred. In Kentucky contributory negligence may be pleaded as a defense to such action. Clarke's Adm'r v. L. & N. R. Co., 101 Ky. 34, 39 S.W. 840, 36 L.R.A. 123; Passamaneck's Adm'r v. Louisville Ry. Co., 98 Ky. 195, 32 S.W. 620; see, also, The A. W. Thompson, 39 F. 115 (D.C.); The City of Norwalk, 55 F. 98 (D.C.); O'Brien v. Luckenbach S. S. Co., 286 F. 301 (D.

C.); Gretschmann v. Fix, 189 F. 716 (D. C.).

The result reached removes from the case any necessity for a consideration of the question of limited liability under tit. 46, § 183, U.S.C. (46 U.S.C.A. § 183).

The decree is affirmed.