John A. RICHARDS, Appellee,

v.

BLAKE BUILDERS SUPPLY INC., and William C. Blake, Appellants.

John B. KING, Jr., Ancillary Administrator of the Estate of John Thomas Turner, Deceased, and Raymond G. Turner, Sr., Administrator of the Estate of John Thomas Turner, Deceased, Appellants,

v.

HARRIS–JOYNER COMPANY, a Foreign Corporation, and Thunderhawk, Ltd., Inc., a Foreign Corporation, Appellees.

Arthur Thomas HAWKS and Marsha Kay Congleton Hawks, Appellants,

v.

HARRIS–JOYNER CO., a North Carolina Corporation; and Thunderhawk, Ltd., Inc., a Foreign Corporation, Appellees.

Nos. 74–2010, 74–2302 and 74–2303.

United States Court of Appeals, Fourth Circuit.

Argued Feb. 5, 1975.

Decided Nov. 10, 1975.

John Richard Newton, Wilmington, N.C. (Rountree & Newton, Wilmington, N.C., on brief), for appellee in No. 74–2010.

Daniel Lee Brawley, Wilmington, N.C. (Lonnie B. Williams, Marshall, Williams, Gorham & Brawley and James L. Nelson, Wilmington, N.C., on brief), for appellants in No. 74–2010.

John B. King, Jr., Norfolk, Va. (Joseph A. Gawrys and Vandeventer, Black, Meredith & Martin, Norfolk, Va., on brief), for appellants (Thorp & Etheridge, Rocky Mount, N.C., on brief for appellants in No. 74–2303), (Allsbrook, Benton, Knott, Allsbrook & Cranford, Roanoke Rapids, N.C., on brief for appellants in No. 74–2302).

Beverly L. Crump, Richmond, Va. (John E. McDonald, Jr., and McDonald & Crump, Richmond, Va., on brief), for appellee Thunderhawk, Ltd., Inc. in Nos. 74–2302 and 74–2303.

Henry H. McVey, III, Richmond, Va. (Guy W. Horsley, Jr., McGuire, Woods & Battle, Richmond, Va., on brief), for ap-

pellee Harris-Joyner Co. in Nos. 74–2302 and 74–2303.

Before HAYNSWORTH, Chief Judge, and CRAVEN and WIDENER, Circuit Judges.

HAYNSWORTH, Chief Judge:

In *Crosson v. Vance,* 4th Cir., 484 F.2d 840, we observed that there was impressive argument for the elimination from admiralty jurisdiction of controversies involving only the operation of small pleasure craft. There we dealt with the claim of an injured water skier against the operator of the towing motorboat. We held that controversy to be not within the admiralty jurisdiction, but we specifically refrained from speculation about the effect of the Supreme Court's holding in *Executive Jet Aviation, Inc. v. City of Cleveland,* 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454, on other controversies involving the operation of small pleasure craft. Now we are confronted with cases arising out of two separate incidents which compel us to address that question. We conclude that admiralty jurisdiction is present, though we think the jurisdiction should be limited to exclude such cases as these.

## THE VIRGINIA CASES

The King and Hawks cases arose out of the explosion of a motorboat while being operated on Lake Gaston, a man-made lake, partly in Virginia and partly in North Carolina, on the Roanoke River. The boat, eighteen feet long and powered by a 170 horsepower inboard-outboard gasoline engine, had been manufactured by Thunderhawk, Ltd. and had been sold to Raymond Turner by Harris-Joyner Company, a retail dealer.

On a summer's day, John Turner, son of Raymond, his wife and two friends, Arthur and Marsha Hawks, were using the boat for an outing on Lake Gaston in Virginia. Shortly after a stop for refueling, there was an explosion, causing the death of John Turner and injuries to Mr. and Mrs. Hawks. These actions were filed by the ancillary administrator for John Turner and by Mr. and Mrs. Hawks against the manufacturer and seller of the boat, alleging causes of action based upon negligence, breach of warranty and strict liability in tort on the part of the manufacturer and the vendor.

The district judge read our opinion in *Crosson* in light of *Onley v. South Carolina Electric & Gas Company,* 4th Cir., 488 F.2d 758 as indicating no intention to limit *Crosson* to its facts. He dismissed all of the actions for lack of admiralty jurisdiction.

## THE NORTH CAROLINA CASE

On a Sunday morning in April, a group of friends left Southport, North Carolina at the mouth of the Cape Fear River to attend a fish fry on a bank of the river, apparently upstream from Wilmington. After the fish fry, they decided to go still farther upstream to the first lock and the dam. The plaintiff, John Richards, was one of the passengers in a twenty foot boat powered by two outboard motors which was owned by Blake Builders Supply, Inc. and operated by William Blake. En route up the river from the fish fry, the boat suddenly swerved to port and crashed into the bank. John Richards was seriously injured. In his complaint, the plaintiff claimed negligence on the part of William Blake in the operation of the boat. He sought a large amount in damages. In its reply, Blake Builders Supply, Inc., the owner, sought a limitation of its liability to the value of the boat.

The district judge denied a motion to dismiss for want of admiralty jurisdiction.

## GENERAL

Both of these occurrences were on navigable waters. Oceangoing vessels ply the Cape Fear River, at least as far as Wilmington. The record presently does not show the extent of commercial use of the river upstream from Wilmington, but the reference to the lock suggests there is some.

There is nothing to suggest that Lake Gaston, though navigable, supports any substantial commercial activity.

In each case the vessel involved was purely a pleasure craft and was being utilized for the pleasure and recreation of its occupants.

## DISCUSSION

The admiralty jurisdiction of the federal courts derived from the conviction of the members of the Constitutional Convention that there was a need for a uniform body of laws, in general harmony with the laws of other maritime nations, for the conduct of the shipping business. Thirteen separate bodies of law were thought quite unacceptable for the governance of international trade. Regulation of the shipping industry was close to the conduct of foreign affairs, and those engaged in the industry were thought to have a need of predictability for their rights and liabilities.[1] The admiralty jurisdiction was created to serve commercial shipping interests by providing a uniform body of law for the resolution of legal disputes arising among those engaged in it.

The great increase in the ownership and use of small pleasure craft is a modern phenomenon. Save for those in charter service, their owners and operators have no commercial interests to protect. Ships in foreign commerce or in the coastal trade move regularly from country to country or from state to state, but pleasure craft generally have a much narrower range. Those operated on lakes and waterways forming state boundaries may cross those boundaries with frequency, but many others will never be operated outside the state in which the owner resides. Their interstate contact, for the average pleasure craft, is not likely to be greater than that of the average privately owned automobile.

If there be a continuing need for a relatively uniform body of laws for the governance of the commercial shipping industry, there is no such apparent need for the regulation of the operation of private pleasure craft aside from the Rules of the Road, laws and regulations relating to lights and the provision and maintenance of lifesaving and safety equipment and similar matters. The Congress, by statute, and the Coast Guard, by regulation, can provide all of the uniform rules needed for the operation of small pleasure craft, but those can be interpreted and enforced by state courts as well as by federal judges.

Indeed, Professor Stolz views the operation of small pleasure craft as being so local in nature that a uniform body of laws is a positive detriment and that transfer of the jurisdiction to the states would be generally advantageous. He was particularly concerned with the inapplicability of state statutes and the inability of state legislatures and state courts to consider local needs in an area in which the Congress, with all of its other pressing concerns, may well be indifferent. He expected the great majority of cases arising out of the operation of such small craft to be brought in state court systems, under the saving to suitors clause, as probably they are, systems which are as capable of dealing with controversies arising out of a collision of two small motorboats as with controversies arising out of the collision of two automobiles on an interstate highway. He thought that state legislatures and state courts should be freed of the need of applying federal maritime law and that those controversies getting into federal courts by some means should be governed by state law.

As Professor Stolz, Professors Gilmore and Black recognize that the best reason for the admiralty jurisdiction is the need of a special court for the governance of the maritime industry and that contro-

---

1. The history is traced in Stolz, *Pleasure Boating and Admiralty: Erie at Sea,* 51 Cal.L.Rev. 661, particularly 666 et seq., and in Chapter 1 of Gilmore & Black, *The Law of Admiralty* (2nd Edition).

versies involving "motorboat accidents on lakes substantially landlocked" have no business in that court.[2]

If there be no reason for the application of federal maritime law to the operation of a small pleasure boat on Lake Gaston, there are some reasons for not applying it. If the warranties upon which the plaintiffs in these Virginia cases are relying arise out of a contract or a state's commercial code, there is doubt about admiralty's jurisdiction to enforce them.[3] There is some doubt that an admiralty court would enforce the doctrine of strict liability in tort of a manufacturer, a doctrine which has been emerging in the state courts.[4] Surely, the limitation of liability to the value of the boat of an owner without "privity or knowledge" of the fault in the context of a small pleasure craft capable of causing death or grievous injury is in conflict with our senses of justice and appropriateness. It may have been necessary to provide an owner of a commercial vessel with the right to limit his liability to the after event value of the vessel; American shipping was in competition with English shipping where there was such a right, and members of the industry may have been thought in need of protection from exposure to all of the economic consequences of major disasters. But we can perceive no reason to extend that protection to the relatively affluent owners of pleasure boats and their insurers at the expense of those injured or killed and their families. Professors Gilmore and Black were moved to say "No theory can justify the results reached in *Coryell v. Phipps* or *The Trillora* under which the owner of a yacht or speedboat, who is provident enough to hire someone else to run the boat for him, is granted a general license to kill and destroy."[5] The fact is, however, that in *Coryell v. Phipps* it was the Supreme Court speaking and, in the North Carolina case, Blake Builders Supply, Inc. may be entitled to the limitation it sought.

If there be a strong case for the relinquishment of admiralty jurisdiction in controversies arising out of the operation of small pleasure craft on inland lakes, it does not extend to every vessel maintained and operated for the pleasure of her owner, his family and friends. There are oceangoing yachts, ships rather than boats, and quite small craft operate regularly in the Gulf Stream and in other areas sufficiently far offshore to be without the jurisdiction of any state. Perhaps what is needed is congressional attention to the matter, for the Congress, after hearings, could tailor the jurisdiction to the need, relinquishing to the states and to their judicial systems those controversies better handled there while retaining for federal admiralty jurisdiction those controversies for which it is better equipped.[6]

Meanwhile, however, we do not feel that we are free to read into the Supreme Court's holding in *Executive Jet Aviation* a release from what seems to have been the settled course of decision in the Supreme Court as well as in the lower federal courts.

In *Executive Jet Aviation* there was stated disapproval of decisions holding claims by injured water skiers against the operators of towing motorboats to be within the admiralty jurisdiction. The Supreme Court's treatment of such cases as aberrations warranted us, in *Crosson,* in holding that such claims were not within admiralty jurisdiction. There was no such critical reference to the Supreme Court's own prior treatment of other controversies arising out of the operation of small pleasure craft.

2. Gilmore & Black, supra n. 1, Section 1–10, page 30.

3. *See Dudley v. Bayou Fabricators, Inc.,* D.C.S. D.Ala., 330 F.Supp. 788.

4. *See,* however, *Lindsay v. McDonnell-Douglas Aircraft Corp.,* 8th Cir., 460 F.2d 631.

5. Gilmore & Black, Section 10–22, p. 882, quoted by Stolz at 706, n. 188; *see* also *Petition of Porter (The Yacht Julaine)*, D.C.S.D. Tex., 272 F.Supp. 282.

6. The jurisdiction is founded upon the constitutional grant, of course, but the Congress should have authority to define its dimensions along its periphery.

In *Levinson v. Deupree,* 345 U.S. 648, 73 S.Ct. 914, 97 L.Ed. 1319, a wrongful death action arising out of a collision of two motorboats on the Ohio River was treated as being in admiralty. There was no discussion of the question whether the admiralty jurisdiction extended to the controversy. Apparently no one thought it open to question. The answer was assumed and the question resolved under federal maritime law. In *Just v. Chambers,* 312 U.S. 383, 61 S.Ct. 687, 85 L.Ed. 903, and *Coryell v. Phipps (The Seminole),* 317 U.S. 406, 63 S.Ct. 291, 87 L.Ed. 363, the Supreme Court dealt with limitation of liability proceedings by owners of pleasure boats. In *Just* the claim was denied because the fault was within the privity or knowledge of the owner. In *Coryell* it was allowed.[7] In neither case did the Supreme Court discuss the jurisdictional question. It was assumed that admiralty jurisdiction extended to the operation of pleasure boats and the Court's attention was simply focused upon the application of the admiralty rule of limitation of liability.

Thus, in at least three instances, the Supreme Court has treated pleasure boats as being within the admiralty jurisdiction, without a suggestion of any doubt about the matter. Nor did the Court, in *Executive Jet Aviation,* cast any doubt about its own prior holdings. It did not include those cases within the group of motorboat cases of which it did express disapproval. Under those circumstances, we do not think we can read *Executive Jet Aviation* as having overruled the earlier cases in the Supreme Court, or even as reopening the whole general question for reconsideration in the lower federal courts.

When a land based airplane on a flight between two points within the continental United States crashes into navigable waters, the Supreme Court held, in *Executive Jet Aviation,* that the controversy was not within the admiralty jurisdiction for there was no showing of any connection with maritime commerce or navigation. In these cases, the business of commercial shipping has no presence, but these small pleasure boats were certainly vessels in navigation, and the controversy arose out of their navigation. There is thus a maritime connection not present in *Executive Jet Aviation.* Since we cannot read the Court's opinion in *Executive Jet* as a general questioning of its earlier opinions in pleasure boat cases, we must conclude that the operation of these boats was within the admiralty jurisdiction and the new rule as stated in *Executive Jet.*

Conceptually, we have some difficulty distinguishing between the claim by a water skier against the operator of a towing boat and a claim by a passenger against the operator of a motorboat. In the one instance, however, judicial resolution of the matter against admiralty jurisdiction is uncomplicated, while a judicial ruling involving motorboats in general should be confined so that controversies are not left to state judicial systems which they cannot handle, or cannot handle as well as admiralty courts. More particularly, however, the Supreme Court, in the one instance, gave us explicit leave to hold the controversy outside of admiralty jurisdiction while its own decisions seem to call for an exercise of the jurisdiction and an application of general maritime law when the claimants are occupants of the boat.

Accordingly, the order dismissing the Virginia cases for want of admiralty jurisdiction is reversed, and the order denying the motion to dismiss the North Carolina action is affirmed.

Nos. 74-2302/74-2303 *reversed,* and No. 74-2010 *affirmed.*

---

7. The Seminole may have been engaged in commerce, for it had been subject to charter. *See* 39 F.Supp. 142, the opinion of the trial court, but the Supreme Court did not allude to that fact and apparently treated The Seminole as any other yacht.