**In the Matter of the Complaint of Robert J. DILLAHEY as Owner of one 28 foot 1978 Cigarette Power Boat, Registration No. NJ3423W, Serial No. CRT282430378 for Exoneration From and Limitation of Liability.**

Civ. A. No. 89–2971.

United States District Court,
D. New Jersey.

April 2, 1990.

As amended April 19, 1990.

John T. Biezup, Daniel J. Maher, Palmer, Biezup & Henderson, Haddonfield, N.J., for petitioner.

RODRIGUEZ, District Judge.

This matter comes before the court on a petition for exoneration from and limitation of liability for personal injury and damages resulting from the collision of two pleasure crafts pursuant to the Limitation of Liability Act ("Limitation Act"), 46 U.S.C.App. § 183 (1958). The court must determine whether pleasure boats are entitled to the vast liability protections afforded by the statute. Several district courts recently have determined that the limitation statute does not apply to pleasure boats. The Third Circuit, however, has not specifically addressed this issue. Additionally, although the Supreme Court has addressed the question of whether noncommercial activity falls within admiralty jurisdiction, the Court has never expressly discussed pleasure boats with respect to the scope of the Limitations Act.

I.

Petitioner Dillahey is the owner of a 28–foot 1978 cigarette power boat. On June

18, 1989, petitioner, piloting the boat, set sail from the Steelmanville Landing on the Pactong Creek, New Jersey around 11:30 a.m. and headed into the navigable waters of the Great Egg Harbor River. At approximately 3:40 p.m., petitioner's vessel and a small boat operated by Diane Yetter collided. This collision resulted in damage to both vessels and injuries to persons aboard the Yetter vessel, including the loss of at least one life. The record does not reveal the specific type of craft operated by Ms. Yetter. On July 10, 1989, Dillahey filed his petition for limitation of liability to the value of his boat. According to petitioner's complaint, the value of the vessel was only $29,000 after the accident. There was no freight pending.

The core portion of the Limitation of Liability Act is section 183(a) which states:

> The liability of the owner of any vessel, whether American or foreign, for any embezzlement, loss, or destruction by any person of any property, goods, or merchandise shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall not, except in the cases provided for in subsection (b) of this section, exceed the amount or value of the interest of such owner in such vessel, and her freight then pending.

The sole issue before this court is whether pleasure boats fall within the protection of the Limitation Act.

## II. EVOLUTION OF THE ACT

### A. Enactment

The Limitation of Liability Act was passed in 1851 for the express purpose of aiding the fledgling American merchant marine by putting it on a par with its British competitors, whose shipping had been protected by limitation laws for a century. Harolds, *Limitation of Liability and Its Application to Pleasure Boats*, 37 Temp.L.Q. 423, 426 (1964). Protection was required because commercial shipping at the time was a high risk profession for many reasons succinctly summed up by the court in *Complaint of Tracey*, 608 F.Supp. 263 (D.Mass.1985):

> The investor who supported a shipping venture had no control over the conduct of his ship once it left port. Given the primitive vessels and the hazards of the sea, the potential common law liabilities of the shipowner as principal made the shipping industry an unattractive investment. Greater liability would result in greater cost. Leaving the United States shipowner without protection would put him at a competitive disadvantage in the world shipping market.

*Id.* at 266.

This original statute was based largely on its British counterparts and contained a provision borrowed from the English statute that "excluded canal boats, barges and lighters, and all vessels on inland waters." Stolz, *Pleasure Boating and Admiralty: Erie at Sea*, 51 Calif.L.Rev. 661, 707 (1963).[1] In light of this provision, one of the first cases involving the application of the Act, which also involved a pleasure boat accident on an inland river, held that it was only applicable to crafts engaged in what was generally known as maritime commerce. *The Mamie*, 5 F. 813 (E.D. Mich.1881). In *The Mamie* the court stated:

> The act is limited by the intention of Congress in enacting it, which was to encourage commerce and to enable American vessels to compete with those of other maritime nations whose laws extended a like protection to shipowners.

---

**1.** When the Limitation Act was introduced to the Senate in 1851 Senator Hamlin, Chairman of the Commerce Committee, in support of the statute stated that the limitation clauses were "substantially the English law.... We should place our commercial marine upon an equal footing with her [England].... That is what the bill seeks to do and it asks no more."

Sprague, *Limitation of Ship Owners' Liability*, 12 N.Y.U.L.Q. 568, 578 (1935). The provision of the Act stating that it was not to apply to owners of canal boats, barges or lighters was similar to the Fifth Section of the Act of 53 George III which exempted barges and vessels used solely in inland navigation. *Id.* at 574, 578.

This is again limited by the constitutional provision that the power of Congress shall extend only to commerce between states or with foreign countries. Hence, it seems to me that, if the vessel be not engaged in what is ordinarily understood as maritime commerce, she is not entitled to the benefit of the act, though she may be an enrolled and licensed vessel, and subject to the navigation laws of the United States. It is true that in some sense navigation is commerce, yet I can readily conceive there may be a class of vessels between states which are not within the act. Sail boats carrying passengers for hire between places in different states, as between watering places on the Atlantic Coast, as well as skiffs, canoes, and small craft, are examples of this kind. The exceptions in the act itself indicate the intention of Congress to restrict its benefits to what is generally known as maritime commerce, though it may also happen to be commerce between the states.

*Id.* at 819. Thus, the Limitation Act was originally interpreted as to exclude pleasure boats.

### B. 1886 Amendment

In 1886, as a result of the increased importance of commerce on inland waterways to the development of the shipping industry, the Act was amended to extend its protection to "all vessels used on lakes or rivers or in inland navigation, including canal boats, barges and lighters." 46 U.S.C.App. § 188 (1958). This amendment afforded American shipowners far more protection that their foreign competitors and constituted a significant departure from the original purpose of the Act. The reasons for extending the privilege of limitation to inland shipping are obscure. Stolz, *supra*, at 708. The extension appears attributable to the climate of the late 19th century when "the sun shone on invested capital as it had done in no other period of our history." Gilmore & Black, *The Law of Admiralty*, 820 (2d ed. 1975). It was the height of the industrial revolution and attitudes of the time favored aiding private investment and commercial development.

A strong merchant marine was a necessary ingredient for a successful national economy in such competitive times.

Although the 1886 amendment makes no mention of noncommercial boats, the amendment "became the basis of authority under which admiralty courts eventually claimed the right to grant limitation of liability to the owner of a pleasure rowboat as well as the owner of a trans-Atlantic ocean liner." Harolds, *supra*, at 427. However, the fact that the amendment continued the limitation of liability to the interest in the vessel and her pending freight further underscores the Act's commercial intent. *Id.* Also, at the time of the amendment, the meaning of the word "navigation" was "maritime commerce" which further supports exclusion of pleasure boats. Stolz, *supra*, at 708.

Like the original Act, the legislative intent behind the amendment was to aid the shipping industry. "Nowhere in the legislative history is there any indication that it was also intended to abet the owners of pleasure craft. And extension of the limitation principles to pleasure craft does not further the express purpose of Congress to make American shipping and shipbuilding interests competitive with those of other nations of the world." 7a J. Moore & A. Pelaez, Moore's Federal Practice ¶ 215[5] (2d ed. 1988).

Clearly, the 1886 amendment does not compel inclusion of pleasure boats under the Act. It has been interpreted by the courts to do so primarily because of initial broad readings of what constitutes a "vessel." Because the Act does not specify size or type of vessel, the term can be construed broadly to apply to almost anything that floats, or narrowly to include only commercial vessels. Either interpretation would be consistent with the legislative intent. In 1927, the United States District Court for the Southern District of New York specifically held pleasure boats entitled to the protection of the Act stating that, "[t]he possibility that the owner of a pleasure yacht is not within the protection of the limited liability statutes seems never to have occurred either to proctors or

judges who have heretofore been concerned in limitation proceedings having to do with such craft." *The Luvina,* 1927 A.M.C. 327, 328 (S.D.N.Y.1927).

### C. 1935 Amendment

The Act was amended again in 1935 to include a provision which required, in cases of claims for loss of life and bodily injury, a minimum limitation fund of $60 per ton. 46 U.S.C. § 183(b) (1958). Under this change, a sunk vessel would no longer eliminate a shipowner's liability. This amendment reflected the abrupt change in the political climate during the depression and underscored emphasis of the "small man." Angino, *Limitation of Liability in Admiralty: An Anachronism from the Days of Privity,* 10 Vill.L.Rev. 721, 729 (1965).

Since the 1930's, both legislative and judicial enthusiasm for the limitation principle has steadily dwindled. The 1935 amendments adverse to shipowning interests reflect a decline in legislative enthusiasm for the Act. Gilmore & Black, *supra,* at 821. "Subsidies had become a more common method of aiding favored industries, and seamen, not shipowners, were the favored darlings of the day." Angino, *supra,* at 729. Justice Black, indicated the increasing concern in his oft-quoted dissent in *Maryland Casualty Co. v. Cushing,* 347 U.S. 409, 74 S.Ct. 608, 98 L.Ed. 806 (1954):

> Judicial expansion of the Limited Liability Act at this date seems especially inappropriate. Many of the conditions in the shipping industry which induced the 1851 Congress to pass the Act no longer prevail. And later Congresses, when they wished to aid shipping, provided subsidies paid out of the public treasury rather than subsidies paid by injured persons.

In addition, the Limitation Act, passed before the corporation had become the standard form of business organization and before the present forms of liability and indemnity insurance were available, showed increasing signs of economic obsolescence.

Gilmore & Black, *supra* at 822. Thus, it is probable "that the judicial attitude in the second half of the twentieth century will be on the whole hostile to the limitation idea, that the early cases will be whittled down if they are not flatly overruled, that the statute, without further limiting amendments, will be narrowly and not expansively construed." *Id.*

### D. The Act Today

The Limitation of Liability Act stands today virtually as it did in 1935.[2] Surprisingly, in light of the societal and economic changes during the past 50 years, Congress has neither amended the statute since that time nor clarified the term "vessel". In fact, "vessel" is more ambiguous today as a result of the development of a variety of water vehicles.

## III. SUPREME COURT CASES

The Supreme Court has considered at least five cases involving pleasure boats under the Limitation Act. The Court, however, has never directly addressed the propriety of including pleasure boats within the Limitations Act, but instead merely discussed the issue of federal jurisdiction.

In *Spencer Kellogg & Sons, Inc. v. Hicks,* 285 U.S. 502, 52 S.Ct. 450, 76 L.Ed. 903 (1932), a motor launch used to ferry employees across the Hudson River ran across a cake of ice and sank resulting in extensive loss of life and injury to the passengers. The Court assumed that pleasure boats fell within the statute in denying a petition for limitation because of the petitioner's knowledge of the boat's condition. The Court, however, did not discuss whether the launch should be included under the Limitation Act. Additionally, although the launch itself was not a commercial vessel engaged in maritime commerce, the commercial corporation used the launch in the company's business. Thus, the launch was not a vessel used solely for pleasure purposes. Harolds, *supra,* at 429.

2. The Act was most recently amended in 1984. In this amendment, the legislature increased the minimum limitation fund available in cases of claims for loss of life and bodily injury from $60 to $420 per ton. This amendment reflects the importance of compensating those who have suffered a loss.

In *Just v. Chambers,* 312 U.S. 383, 61 S.Ct. 687, 85 L.Ed. 903 (1941) the main issue before the Court was whether the maritime tort survived the death of the tortfeasor when an owner's privity of fault had been established. Though the vessel involved was a yacht engaged in pleasure activity, the Court, with no discussion, assumed that the limitation of liability laws were applicable to the craft.

The Court in *Coryell v. Phipps,* 317 U.S. 406, 63 S.Ct. 291, 87 L.Ed. 363 (1943) reviewed a situation where a fire on board a private pleasure yacht in storage spread to and destroyed neighboring boats. The main issue before the Court was the amount of privity or knowledge required of a private owner versus a corporate owner. Again, the Court, without discussion or argument, assumed that the limitation laws applied to pleasure craft.

In *Levinson v. Deupree,* 345 U.S. 648, 73 S.Ct. 914, 97 L.Ed. 1319 (1953), the Court addressed whether federal law controls whether a state-appointed administrator may amend its pleading. The facts underlying the action involved the collision of two motorboats on the Ohio River which resulted in the death of a woman. The Court assumed the motorboats were included in federal admiralty jurisdiction and went on to hold that federal law controls the amendment of pleadings.

In *Foremost Insurance Co. v. Richardson,* 457 U.S. 668, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982), the Supreme Court confronted the issue of whether the collision of two pleasure boats on navigable waters falls within the admiralty jurisdiction of the federal courts. *Id.* at 669, 102 S.Ct. at 2655. The Court in its opinion sets forth a list of nine district court factual findings that makes clear that the vessels involved in the collision had no relationship with commercial activity. *Id.* at 670–71, 102 S.Ct. at 2656–57. The Court stated that "[b]ecause the 'wrong' here involves the negligent operation of a vessel on navigable waters, we believe that it has a sufficient nexus to traditional maritime activity to sustain admiralty jurisdiction in the District Court." *Id.* at 674, 102 S.Ct. at 2658.

The *Foremost* Court focused on the need for *all* operaters of vessels on navigable waters to be subject to uniform rules of conduct in order to fully vindicate the federal interest of protection of maritime commerce.

Many lower courts have read the Supreme Court's assumptions and decision in *Foremost* that the non-commercial nature of the vessel is irrelevent as precedent for the proposition that pleasure boats must fall under the limitation act. These same cases agree, however, that policy arguments support the contrary positions. *See Petition of Porter,* 272 F.Supp. 282, 285 (S.D.Tex.1967) (appealing as arguments for excluding pleasure boats may be court did not consider itself justified in deviating from settled case law); *Richards v. Blake Builders Supply, Inc.,* 528 F.2d 745, 748 (4th Cir.1975) (court perceives no reason to extend limitation to pleasure boat owners, however, it does not feel free to deviate from decisions in *Coryell* and *Just*); *Gibboney v. Wright,* 517 F.2d 1054, 1057 (5th Cir.1975) (court acknowledges that contemporary thought finds little reason for allowing private owners of pleasure craft to take advantage of statute but it feels bound by Supreme Court decisions and Congress); *Complaint of Brown,* 536 F.Supp. 750 (W.D.Ohio 1982) ("Much logic, and good sound policy reasons support claimants argument and, were we writing on a clean slate, this court might be inclined to accept it. However, in view of the long line of precedent to the contrary, this court does not consider itself justified in deviating from settled case law."). It has only been within the last five years that certain district courts have refused to allow the owners of pleasure boats to avail themselves of limited liability.

## IV. RECENT TREND

The 20th century has witnessed a severe criticism of the right of owners of recreational vessels to limit their liability and a developing trend to deny pleasure craft owners the benefits of the Limitation Act. This trend has culminated recently in a series of district court cases holding that

pleasure boats are excluded from the protections of the Limitation Act. *See, e.g., Baldassano v. Larsen,* 580 F.Supp. 415 (D.Minn.1984); *Complaint of Tracey,* 608 F.Supp. 263 (D.Mass.1985); *Matter of Lowing,* 635 F.Supp. 520 (W.D.Mich.1986), *Estate of Lewis,* 683 F.Supp. 217 (N.D.Cal. 1987), *Matter of Sisson,* 668 F.Supp. 1196 (N.D.Ill.1987) *aff'd,* 867 F.2d 341 (7th Cir. 1989). In the leading case *Baldassano,* Chief Judge Miles W. Lord excluded pleasure boats from the protection of the Limitation of Liability Act stating, "[b]asically, the court finds that this admiralty statute was never designed to cover pleasure boats ... and that to allow [plaintiff] to take advantage of this Act would result in a gross miscarriage of justice." 580 F.Supp. at 416. In *Baldassano,* the court, although mindful of the Supreme Court decisions, declared that the pleasure boats limitation was one that "cries out for remedial adjudication, and this court cannot ignore the fundamental unfairness of the law as it exists." *Id.* at 419–20. As the court explained:

> It would be grossly unfair to apply the Act to the instant case. Baldassano and his fellow passengers took off on a short recreational voyage. Their mission, if any, was to enjoy some surfboarding. How removed this is from the activities envisioned by the Act: moving huge cargoes from port to faraway port. These commercial maritime vessels for which the Act was designed are likely to be enormously expensive; even if liability is limited to their value, the owners pay a stiff penalty and the Act's inequities are lessened. By contrast, here the value of a pontoon is a mere $7,500. To limit liability in a case such as this would be as outrageous as allowing an automobile owner to limit his liability to the value of his car should he crash while out on a Sunday drive.

*Id.*

This recent trend also reflects the evolution of the pleasure boat. At the time of the original act, the pleasure boats of today were beyond contemplation. In the 1850's, steamboats were the norm and in 1937 a modern 70–horsepower motorboat was capable of going only 35 miles per hour ("mph"). *See Feige v. Hurley,* 89 F.2d 575 (6th Cir.1937). Today, even the least sophisticated of automobiles, or for that matter, a moped is capable of attaining 35 mph.

Not only has the pleasure boat changed but the extent of pleasure boating has increased beyond what anyone could have envisioned in the late 19th century. "Pleasure boating is ... the product of a technology that can produce small boats at modest cost and of an economy that puts such craft within the means of almost everyone." Stolz, *supra,* at 661. In the late 1800's, the technology did not exist for the mass production of small motor boats and the economic climate of the Depression did not permit a majority of people to purchase such crafts even if available.

Many courts, however, have included pleasure boats under the Act to preserve the "uniformity and certainty in the present rule that admiralty jurisdiction extends to all accidents occurring between surface vessels on navigable waters." *Complaint of Brown,* 536 F.Supp. 750, 753 (W.D.Ohio 1982); *see also In re Young,* 872 F.2d 176 (6th Cir.1989). "The admiralty jurisdiction of the federal courts derived from the conviction of the members of the Constitutional Convention that there was a need for a uniform body of laws, in general harmony with the laws of other maritime nations, for the conduct of the shipping business. Thirteen separate bodies of law were thought quite unacceptable for the governance of international trade." *Richards v. Blake Builders Supply, Inc.,* 528 F.2d 745, 747 (1975).

Today, however, commerce is not by sea exclusively. *See Stolz, supra,* at 671. Additionally, pleasure boats do not involve national commerce considerations. As one commentator explained:

> Commerce and uniformity go together. There is virtue in having the same rules applied to ships and their cargoes moving from port to port: uniformity promotes the free movement of trade by increasing the confidence of merchants in their ability to conduct business successfully. That, and no more, seems to have been

what the framers had in mind in granting civil admiralty jurisdiction to the federal courts. But where commerce stops, the need for uniformity also ends. If commerce is not involved, there is no national interest in uniformity and there is every reason associated with federalism for local power to govern events occurring locally that have only local impact.

*Stolz, supra,* at 671. In addition, "the law became clear that federal admiralty jurisdiction in tort cases arose only when the tort resulted from activity relating to a vessel on navigable waters and activity having a significant relationship to traditional maritime activity." *Sisson,* 668 F.Supp. 1196, 1198 (N.D.Ill.1987), *aff'd,* 867 F.2d 341 (7th Cir.1989) (citing *Executive Jet Aviation, Inc. v. City of Cleveland,* 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972), *Foremost Ins. Co. v. Richardson,* 457 U.S. 668, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982)). "Limitation, designed to coax investors into maritime shipping, serves no useful purpose when the investment is in a personal pleasure vessel." 45 La.L.Rev. 179, 196 (1984). *See also Baldassano,* 580 F.Supp. 415, 418 ("The history and purpose of the limitation statute make it obvious that it was never meant to apply to pleasure boats, and allowing these small craft to creep under this Act's coverage perverts justice."); *Tracey,* 608 F.Supp. 263, 268–9 (because of low value of pleasure boats compared to commercial ships owner "who is successful in limitation may undercompensate a victim with a meritorious claim. Such unjust results become particularly shocking where the post-accident value of the pleasure boat, and thus the liability limitation of the owner, is low and the harm to the innocent victim is high, as in

the case of loss of life."); *Sisson,* 668 F.Supp. 1196, 1198.

## V. APPLICATION

### A. Supreme Court Cases

After an extensive review, it is evident that although the Supreme Court appears to have foreclosed the issue of whether pleasure boats fall within the protection of the liability act, society has drastically changed since 1850 when Congress enacted the Limitations Act. First, the growth of both the corporate and economic structures has decreased our reliance on the merchant marine for the nation's economic survival. Additionally, the rise of corporate ownership and the availability of insurance protection, new since the 1850's, renders ship ownership less risky. Also even though federal jurisdiction is essential for uniformity of the rules governing the seas, exoneration for pleasure crafts is not. Finally, the existence of greatly improved technology allows owners to retain greater control over their vessels and crews outside of the port. Consequently, although this court is bound by the Supreme Court's *Foremost* decision, these drastic societal changes dictate congressional re-evaluation of the statute.

### B. Circuit Court Cases

The Third Circuit has yet to rule on the pleasure boat issue.[3] Six circuit courts have addressed the issue since the *Baldassano* case and all six declined to follow the recent district court trend.[4] The Fourth Circuit in *Complaint of Shaw,* 1989 AMC 116 (4th Cir.1988) reversed the district court which excluded pleasure boats from the Act. The Fourth Circuit reaffirmed its holding in *Richards,* 528 F.2d 745 (4th Cir. 1975) stating that it was bound to follow

**3.** In *Armour v. Gradler,* 448 F.Supp. 741, 749 (W.D.Pa.1978), the district court agreed that the Limitation Act should not apply in circumstances where a vessel is used purely for pleasure, however, because "no reported case in recent time has denied limitation of liability under the Act for the reason that the vessel was a pleasure craft" the court found that pleasure boat owners could invoke § 183 of the Act. *Id.* at 749. Since 1978, however, several district courts have ruled to exclude pleasure boats.

**4.** The Seventh Circuit declined to limit liability for a moored pleasure craft at a recreational marina based on its conclusion that a sufficient nexus to traditional maritime activity did not exist. *In re Sisson,* 867 F.2d 341, 344–50 (7th Cir.1989). The *Sisson,* court, however, made clear that its decision not to limit liability was not based simply on the fact the tort involved a pleasure, rather than commercial, vessel. *Id.* at 344.

Supreme Court precedent: "In *Richards* this Court expressed reservation but nonetheless found that the Limitation of Liability Act does apply to pleasure boats. We noted then and we affirm now that we are bound to follow the United States Supreme Court's holding in *Coryell v. Phipps*, 317 U.S. 406, 63 S.Ct. 291, 87 L.Ed. 363 (1912) that a yacht owner could be protected by the Limitation of Liability Act." *Complaint of Shaw*, 1989 AMC 116, 117.

The Sixth Circuit *In re Young*, 872 F.2d 176, 178, resisting "the urge to judicially legislate a solution," reversed a United States District Court for the Northern District of Ohio decision excluding pleasure boats. In so deciding, the court expressed its disagreement with the district court's holding *In re Lowing*, 635 F.Supp. 520 (W.D.Mich.1986) in that circuit. Based on the Supreme Court cases and the fact that no circuit court had refused to apply the statute to pleasure boats, the *Young* court held that pleasure boat owner's were entitled to avail themselves of the protections of the Limitation of Liability Act. In addition, the *Young* court was constrained by the 1937 Sixth Circuit case *Feign v. Hurley*, 89 F.2d 575 (6th Cir.1937) stating that one "panel of this Court cannot overrule the decision of another panel. The prior decision remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision." *Young*, 872 F.2d at 177 (citing *Salmi v. Sec'y of Health and Human Services*, 774 F.2d 685, 689 (6th Cir.1985)).

The Seventh Circuits *In re Sisson*, 867 F.2d 341 (7th Cir.1989), *cert. granted*, — U.S. ——, 110 S.Ct. 863, 107 L.Ed.2d 947 (1990), examined the question of whether a fire aboard a non-commercial vessel docked at a recreational marina on navigable waters bears a significant relationship to traditional maritime activity and hence, permits the exercise of admiralty jurisdiction. First, the court rejected the district court's determination that admiralty jurisdiction was precluded merely because the tort involved a pleasure, rather than commercial, vessel. The *Sisson* court relying on the analysis in *Executive Jet* and *Foremost* established the following two prong test for admiralty jurisdiction in non-commercial tort cases: (1) whether the tort had a potentially disruptive impact and (2) whether it involved navigation. Because the facts in *Sisson* did not involve navigation, the court held that a fire on a moored pleasure yacht in a recreational marina did not satisfy the traditional maritime activity requirement of admiralty jurisdiction. *Id.* at 349–50.

The Ninth Circuit Court of Appeals has also included non-commercial pleasure boats within the Limitation Act. *See In re Hechinger*, 890 F.2d 202, 204 (9th Cir.1989). In *Hechinger*, a forty-nine foot trawler was damaged when it encountered large twenty to twenty-five foot waves. *Id.* at 204–06. The court found the reasoning in *Young* persuasive and held that the limitation provisions apply to pleasure boats. *Id.* at 206.

In *Keys Jet Ski, Inc. v. Kays*, 893 F.2d 1225 (11th Cir.1990), the Eleventh Circuit Court of Appeals held that the district court erred in finding that the Limitation Act was not applicable to pleasure craft. *Id.* at 1229. Initially, the court determined that a jet ski constituted a vessel within the Limitation Act. *Id.* at 1230. In its discussion the court noted that although it agreed that the extension of limited liability to pleasure craft such as jet skis was "inconsistent with the historical purposes of the Act, any restriction of the Act's application requires congressional action." *Id.* at 1229.

The most recent decision regarding the applicability of the Limitation Act to pleasure craft comes from the Second Circuit. The *In re Guglielmo* court found that the Act encompassed a twenty-one foot motorboat towing a waterskier for pleasure. 897 F.2d 58, 59 (2d Cir.1990). Based on the language of the statute as well as the Supreme Court's assumption of limitation in *Coryell* and *Just*, the *Guglielmo* court declined to "invent fine distinctions among vessels under Section 183(a) based on presumed legislative intent." *Id.* at 60.

In this district, it appears that only one court has confronted the issue. *See In re Roberto*, 1987 A.M.C. 982, 984, 1986 WL 15685 (D.N.J.1986). Judge Cowen ruled that "exclusion of pleasure craft from the limitation of liability statute should await action by Congress." Although the court agreed with much of the reasoning in *Baldassano* and *Tracey*, it declined to follow the recent trend. The court stated: "[s]ince pleasure yachts are included in subsection (a), the distinction between pleasure craft and commercial craft relied upon by the *Tracey* and *Baldassano* courts, although perhaps wise as a matter of policy, is unpersuasive as a matter of statutory interpretation." *Id.*

## C. Statutory Construction

In determining whether the protection of the Act applies to all boats or just commercial boats, the court must examine the legislative intent behind the statute through an analysis of the statutory language and policy behind the statute. This court is mindful that in analyzing the construction of the statute, "the starting point" is the "language itself." *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975) (Powell, J., concurring). On its face, the statute limits the liability to "all seagoing vessels, and also to all vessels used on lakes or rivers or in inland navigation, including canal boats, barges, and lighters." 46 U.S.C.App. § 188 (1958). However, the term "vessel" is ambiguous. "[P]recisely what constitutes a 'vessel', for purposes of admiralty and maritime jurisdiction, has never been stated by Congress or the courts with comprehensive clarity." 7a J. Moore & A. Pelaez, Moore's Federal Practice ¶ 215 (2d ed. 1988). The determination of what constitutes a vessel is not free of difficulty and "each case depends on its particular facts; and structures shade off from what is obviously a vessel to what is obviously not.'" *Id.* at 2316. A general definition of "vessel" applicable in all instances to which the United States Code applies, except as altered by specific provisions contained therein "includes every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water." *Id.* This is essentially the definition of "vessel" that has been construed as applying to the Limitation Act.

In so construing the meaning of "vessel" many courts have concluded that Congress intended pleasure boats to be included in subsection (a) of § 183 of the Act [5] because subsection (f) specifically excludes pleasure boats from subsections (b) through (e).[6]

5. (a) The liability of the owner of any vessel, whether American or foreign, for any embezzlement, loss, or destruction by any person of any property, goods, or merchandise shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall not, except in the cases provided for in subsection (b) of this section, exceed the amount or value of the interest of such owner in such vessel, and her freight then pending.

6. (b) In the case of any seagoing vessel, if the amount of the owner's liability as limited under subsection (a) of this section is insufficient to pay all losses in full, and the portion of such amount applicable to the payment of losses in respect of loss of life or bodily injury is less than $420 per ton of such vessel's tonnage, such portion shall be increased to an amount equal to $420 per ton, to be available only for the payment of losses in respect of loss of life or bodily injury. If such portion so increased is insufficient to pay such losses in full, they shall be paid therefrom in proportion to their respective amounts.

(c) For the purpose of this section the tonnage of a seagoing steam or motor vessel shall be her gross tonnage without deduction on account of engine room, and the tonnage of a seagoing sailing vessel shall be her registered tonnage: *Provided,* That there shall not be included in such tonnage any space occupied by seamen or apprentices and appropriated to their use.

(d) The owner of any such seagoing vessel shall be liable in respect of loss of life or bodily injury arising on distinct occasions to the same extent as if no other loss of life or bodily injury had arisen.

(e) In respect of loss of life or bodily injury the privity or knowledge of the master of a seagoing vessel or of the superintendent or managing agent of the owner thereof, at or prior to the commencement of each voyage, shall be deemed conclusively the privity or knowledge of the owner of such vessel.

(f) As used in subsections (b), (c), (d), and (e) of this section and in section 183b of this title, the term "seagoing vessel" shall not include

This court notes that the term vessel "may be expressly or impliedly expanded or contracted in specific acts of Congress to carry out the purpose of the particular statute." 7a J. Moore & A. Pelaez, Moore's Federal Practice ¶ 215[5] (2d ed. 1988). In fact, the Limitation Act is illustrative of statutory provisions that are more specific than the Code's general definition. *Id.* at 2313.

It is clear that the term "vessel" is ambiguous as applied to the Limitation Act. Statutory construction demands that "ambiguous provisions should be construed with reference to the statute's manifest purpose...." *Zeigler Coal Co. v. Kleppe,* 536 F.2d 398, 408–09 (1976). Furthermore, "[b]efore a court could consider taking such liberty with statutory language there should be, at least, unmistakable support in the history and structure of the legislation." *Blue Chip Stamps,* 421 U.S. 723, 756, 95 S.Ct. 1917, 1935. Evidence of congressional intent may also be found in the subsequent history of an Act. *Id.*

It is apparent that the policy behind the statute did not remotely apply to pleasure boats. "[T]he same criteria that are used to determine whether a structure is or is not a vessel for general maritime purposes should not always be applicable to limitation cases, especially when pleasure craft are involved ..." 7a J. Moore & A. Peleaz, Moore's Federal Practice ¶ 215 (2d ed. 1988). The sole purpose of the Act and amendments thereto was to encourage American shipping. The statute and its amendments appear to have been commercially motivated.

In light of this background it is strange that the lower courts have insisted upon construing the word "vessel" so broadly as to include pleasure craft when such a construction has no relationship to the statute's purpose to encourage investment in the shipping industry.

*Stolz, supra* at 710.

It is true that subsection (f) excludes pleasure boats from the definition of "seagoing vessels," and such an expressed exclusion ostensibly indicates that pleasure boats fall under subsection (a). The limitation right of subsection (a) does not mean, however,

that *all* inland shipping must be included within the scope of the 1886 amendment. That amendment, as is true of the original act, appears to have been motivated by a desire to aid the shipping industry. Nowhere in the legislative history is there any indication that it was also intended to abet the owners of pleasure craft. And extension of the limitation principles of pleasure craft does not further the express purpose of Congress to make American shipping and shipbuilding interests competitive with those of other nations of the world. What such an extension often does do, however, is discriminate against less wealthy owners of pleasure craft who cannot engage crews to man their vessels, and insulate wealthy owners at the expense of those unfortunate victims whose persons or property happen to get in the way. Surely, such a result does not materially further *either* domestic or foreign American shipping interests; and is far removed from the reasons which originally prompted the enactment of such protective legislation. As previously indicated, in many respects the reasons for limiting liability are not persuasive when purely domestic inland commercial vessels are involved; and such reasoning breaks down entirely when any pleasure craft— whether on the high seas or on inland waters—is the wrongdoer. Furthermore, extension of the doctrine of limitation of liability to pleasure craft is not compelled by the 1886 amendment to the limitation Act. Notwithstanding that the Act provides a right of limitation to the owners of "all vessels used ... in inland navigation", it can properly be construed narrowly in view of its legislative history, which clearly indicates that its enact-

---

pleasure yachts, tugs, towboats, towing vessels, tank vessels, fishing vessels or their tenders, self-propelled lighters, nondescript self-propelled vessels, canal boats, scows, car floats, barges, lighters, or nondescript non-self-propelled vessels, even though the same may be seagoing vessels within the meaning of such term as used in section 188 of this title.

46 U.S.C.App. § 183.

ment was *commercially* motivated. It is submitted, therefore, that for a structure to come within the scope of the statute limiting liability, it should not only qualify as a "vessel" under the more traditional tests but, in addition, it should be engaged in a commercial activity and not merely used for purposes of pleasure. By applying such a test the legislative intent is fulfilled.

7a J. Moore & A. Pelaez, Moore's Federal Practice ¶ 215 (2d ed. 1988).

The Congressional Record does not mention pleasure boats. In addition, it is obvious that such craft, particularly cigarette boats, could never have been within the contemplation of legislators at the time the limitation provision was enacted. Even the courts which state that they are bound by statutory language and precedent to include pleasure boats within the Act appear to do so reluctantly.

## VI.

There has been much societal change since the 1850's. Changes in the corporate and economic structure no longer render the merchant marine as necessary as it once was to the nation's economic prosperity. The risk of being a shipowner is not as high as in the past due to the rise of corporate ownership. Insurance plans, unheard of in the 1850's, are now available to afford shipowners protections that they would not have otherwise had.

Much of the case law relating to the applicability of the Limitation Act to pleasure craft appears to rigidly adhere to the rules of statutory construction thereby allowing the word "vessel" such relentless elasticity so as to afford immunity to speed machines not imaginable in 1850. Consequently, Congress's failure to amend the statute along with the Supreme Court's assumption of limitation and the circuit court cases applying the Limitation Act to pleasure boats support the application of the Act to both commercial and non-commercial vessels. Additionally, the *Foremost* Court's determination that admiralty jurisdiction extends to non-commercial activity is consistent with these strict inter-

pretations of the statutory language. Although this court agrees that admiralty jurisdiction must extend to non-commercial activity in order to maintain uniform rules governing navigation, the need to limit the liability of pleasure craft similar to the cigarette boat here which serves solely non-commercial function, is anachronistic and wholly inconsistent with the purpose of the Act.

This court, however, cognizant of the delineation of its role as an arbiter of disputes influenced by precedent, rather than as a legislator, is bound by the plain language of the statute and the case law interpreting the language. Hence, this court will reluctantly issue a restraining order, and leave to Congress and the Supreme Court the question of the appropriateness of such immunity.

An appropriate order will be entered.

## ORDER

A complaint having been filed on July 5, 1989 by the above-named petitioner, as owner of one 28 foot 1978 Cigarette Power Boat, Registration No. NJ 3423W, Serial No. CRT282430378, for exoneration from or limitation of liability, pursuant to 46 U.S.C.App. §§ 181–188 and Rule F of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, for any loss, damage, injury or destruction caused by or resulting from a June 18, 1989 collision more fully described in the complaint;

AND the complaint having stated that the value of petitioner's interest in the Cigarette Boat at the end of such voyage does not exceed twenty-nine thousand dollars ($29,000.00), and there being no pending freight, as set forth in the Affidavit of Daniel J. Maher, filed herein.

IT IS ORDERED as follows:

1. A notice shall be issued to all persons asserting claims with respect to which the complaint seeks limitation admonishing them to file their respective claims with the Clerk of this Court in writing, and to serve on the attorneys for the petitioner a copy thereof on or before the 18th day of May,

1990 or be defaulted, and that if any claimant desires to contest either the right to exoneration from or the right to limitation of liability, he or she shall file and serve on the attorneys for the petitioner an answer to the complaint on or before the said date, unless his or her claim included an answer to the complaint, so designated, or be defaulted.

2. The aforesaid notice shall be published by petitioner in the *Courier Post* once a week for four successive weeks prior to the date fixed for the filing of claims, as provided by the Supplemental Admiralty Rule F; and copies of the notice shall also be mailed in accordance with Rule F.

3. The continued prosecution of any and all actions, suits, and proceedings already commenced, and the commencement or prosecution thereafter of any and all suits, actions, or proceedings of any nature and description whatsoever in any jurisdiction, and the taking of any steps and the making of any motion in such actions, suits, or proceedings against the petitioner, as aforesaid, or against any property of the petitioner except in this action, to recover damages for or in respect of any loss, damage, injury or destruction caused by or resulting from the alleged incident or done, occasioned or incurred on the said voyage of the Cigarette Board, as alleged in the complaint, be and hereby are restrained, stayed, and enjoined until the hearing and determination of this action;

4. Service of the Order as a restraining order may be made by the post office by mailing a conformed copy thereof to the person or persons to be restrained, or to their respective attorneys or alternatively by hand.