**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

PATSY A. WAGGONER,
Plaintiff-Appellant,

v.

No. 97-1394

NAGS HEAD WATER SPORTS,
INCORPORATED,
Defendant-Appellee.

Appeal from the United States District Court
for the Eastern District of North Carolina, at Elizabeth City.
Terrence W. Boyle, Chief District Judge.
(CA-96-30-2-BO)

Argued: January 27, 1998

Decided: April 6, 1998

Before MURNAGHAN, NIEMEYER, and MOTZ, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Edward Francis Halloran, Virginia Beach, Virginia, for
Appellant. Edward James Powers, VANDEVENTER, BLACK,
MEREDITH & MARTIN, L.L.P., Norfolk, Virginia, for Appellee.
**ON BRIEF:** Michael G. Sweeney, Virginia Beach, Virginia, for
Appellant. R. John Barrett, VANDEVENTER, BLACK, MEREDITH
& MARTIN, L.L.P., Norfolk, Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Patsy Waggoner rented a jet ski from Nags Head Water Sports for herself and her daughter. As part of the rental agreement, she signed a waiver that purported to release Nags Head from"all claims . . . that may arise from [her] use of the craft." Waggoner was injured while riding on the jet ski and sued, alleging that Nags Head negligently maintained and operated the watercraft. The district court dismissed the suit on the grounds that it was barred by the waiver, and Waggoner appealed.

This case arises under our admiralty jurisdiction, 28 U.S.C. § 1333, and is governed by principles of maritime law. See Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527, 543 (1995) (noting that maritime law applies to "the navigation or berthing of pleasure boats, despite the facts that the pleasure boat activity took place near shore, where States have a strong interest in applying their own tort law, or was not on all fours with the maritime shipping and commerce that has traditionally made up the business of most maritime courts"); Richards v. Blake Builders Supply Inc., 528 F.2d 745, 749 (4th Cir. 1975).

I. BACKGROUND

On September 26, 1993, Patsy A. Waggoner, the plaintiff, rented a personal water craft (a jet ski) from the defendant Nags Head Water Sports, Inc. As part of the rental agreement, she signed a pre-printed form titled "Rental Agreement/Waiver." The bottom of the form contained an exculpatory clause which read:

> WAIVER AND ASSUMPTION OF RISKS: I Pat Waggoner voluntary [sic] with knowledge, assume all risk of accident or damages to my person, my passenger of[sic]

2

property which may be incurred from or be connected in any manner with my use, operation or rental of the craft checked above. I hereby release Nags Head Watersports, Inc., it's [sic] agent and emplorees[sic] from all claims, demand, actions, cause of action, and from all liability for damages, losses or injuries that may arise from my use of the craft checked above, including but not limited to attorney's fees. This release and indemnification shall be binding upon my heirs, Administrators, executors and assigns. CUSTOMER SIGNATURE (Lessee)[signed]

According to Waggoner's affidavit, she did not understand that form to allow the defendant to escape liability for its own wrongdoing.

Waggoner rented a single-seated jet ski for her daughter to ride, and a two-seated jet ski for her other daughter which Waggoner and she were to ride together. As the first daughter rode around on the single-seated jet ski, Waggoner claims, the defendant's attendant had difficulty starting the second jet ski. It stalled in attempts to start it, smelled strongly of gas, left a rainbow-colored film on the water, and "made a lot of smelly smoke."

Waggoner was able to ride on the two-seated jet ski, with her daughter driving, for "one loop, or about one and one-half city blocks." While that loop progressed, the two-seated jet ski would only go very slowly and allegedly did not respond proportionately to the use of the throttle. Suddenly the jet ski "accelerated with terrific speed and threw [Waggoner and her daughter] off the back." Waggoner sustained a compression fracture to her vertebra during the fall.

Waggoner sued Nags Head in admiralty, asserting, inter alia, that the injury was due to a malfunction of the jet ski caused by its negligent maintenance. The district court granted summary judgment for Nags Head on the basis that the exculpatory clause signed by Waggoner barred her claim. Waggoner appeals.

II. DISCUSSION

Although Waggoner had some trouble complying with Rule 56(e)'s requirements for opposing a Motion for Summary Judgment, she may

3

have managed to allege sufficient evidence to make out a claim for negligence, but not for gross negligence or recklessness. As the appeal is from a grant of summary judgment, we view the facts in the light most favorable to the non-moving party. See Halperin v. Abacus Technology Corp., 128 F.3d 191, 196 (4th Cir. 1997). However, the plaintiff "may not rest upon the mere allegations or denials of [her] pleading, but [her] response, by affidavits or as otherwise provided in [Rule 56(e)], must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

A. Waggoner's Response to the
        Summary Judgment Motion

On October 25, 1996, Nags Head served a motion for summary judgment on Waggoner's attorneys. The docket records the motion as having been filed on October 8, 1996. According to Rule 4.05 of the Local Rules of Practice and Procedure of the U.S. District Court for the Eastern District of North Carolina, a party has 20 days after the service of a motion to file a written response. Waggoner failed to respond within the allotted 20 days. Instead, on November 29, 1996, Waggoner filed a "rough draft" of a Brief in Opposition to the Motion for Summary Judgment. On December 5, 1996, she filed a "final draft" of that Brief. Neither brief contained any sworn affidavits or other evidence demonstrating that there was a genuine issue for trial.

After Nags Head filed a Reply Brief in support of its summary judgment motion, Waggoner filed a Response to the Reply Brief along with her affidavit. However, Nags Head asserts that it

> has never received copies of these documents, and only became aware of their existence during this appeal upon receipt of the district court's docketing statement. Nags Head was first provided with an unsigned[1] copy of Plaintiff's Affidavit when counsel for [Waggoner] delivered a copy of the Joint Appendix filed herein.

_____

[1] While it is true that the affidavit provided in the Joint Appendix is unsigned (marked "file copy"), the record contains the original, signed and notarized, affidavit.

4

Brief of Appellee at 5 n.2.

A district court has discretion to consider a late affidavit if it chooses to do so. See Orsi v. Kirkwood, 999 F.2d 86, 91 (4th Cir. 1993) (citing Fed. R. Civ. P. 6). A court should generally allow such an exception "only if cause or excusable neglect has been shown by the party failing to comply with the time provisions." Id. Waggoner has offered us no excuse for, nor even mentioned, her delay and we cannot tell whether she provided such excuse to the district court. In fact, we cannot tell from the district court's order whether it chose to consider Waggoner's affidavit or not. Since Waggoner's claim was properly dismissed in any event, we have assumed, arguendo, that we may consider her affidavit.

In addition to the affidavit, Waggoner filed two "expert state- ments," neither notarized nor accompanied by authenticating affida- vits. "To be admissible at the summary judgment stage, `documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e).'" Id., at 92 (quoting 10A Charles A. Wright et al., Federal Practice and Procedure § 2722, at 58-60 (1983 & 1993 Supp.)). The unsworn "expert statements," even if they had been submitted on time, are hearsay and we may not consider them in evaluating the summary judgment motion. See Rohrbough v. Wyeth Laboratories, Inc., 916 F.2d 970, 974 n.8 (4th Cir. 1990).

Without the "expert statements," there is no evidence in the record supporting Waggoner's claim that Nags Head was grossly negligent or reckless in its maintenance of the jet skis. Therefore, the two claims were properly dismissed on summary judgment. Even if we accept Waggoner's affidavit, however, she may not have alleged suf- ficient evidence to support a claim for ordinary negligence, because much of the affidavit is inadmissible hearsay.

B. By Its Terms, the Exculpatory Clause Bars
Waggoner's Claim

Even assuming that Waggoner had attested to sufficient evidence to make out a general claim for negligence, however, the exculpatory clause here at issue bars her suit. It is true that "[a]s a general rule of contract law, contracts releasing a party from liability resulting from

5

his own negligence are looked upon with disfavor, and are strictly construed against the releasee." Krazek v. Mountain River Tours, Inc., 884 F.2d 163, 165 (4th Cir. 1989) (citing Newport News Shipbuilding and Dry Dock Co. v. United States, 226 F.2d 137, 142 (4th Cir. 1955)). Yet, the exculpatory clause here is conspicuous and unambiguous.

The exculpatory clause that Waggoner signed is titled, in all capital letters, "WAIVER AND ASSUMPTION OF RISKS." Her attention was drawn to it, as illustrated by the facts that she had to write her name in the first sentence of the clause and that she signed the document immediately below the clause.

The exculpatory clause states that Waggoner "assume[s] all risk of accident or damages to [her] person . . . which may be incurred from or connected in any manner with [her] use, operation or rental" of the craft. (Emphasis added.) The injury to her back resulting from her fall off of the jet ski was clearly a damage to her person connected with her use of the craft. By signing the clause, therefore, Waggoner assumed the risk of this accident.

Furthermore, the clause recites that its signator "release[s]" Nags Head from "all claims, demand, actions, cause of action, and from all liability for damages, losses or injuries that may arise from [her] use of the craft." (Emphasis added.) Waggoner's claim for negligence is clearly included within the category of "all claims" and "all liability for . . . injuries." Her injury, even if it was the fault of the negligence of Nags Head, arose from her use of the craft. By signing the clause, therefore, Waggoner released Nags Head from this claim.

Waggoner has argued that the exculpatory clause does not bar an action for negligence because it does not expressly state the word "negligence." But the term "all claims" must doubtless include a claim for negligence.**2** Although it applied West Virginia law, the decision

_____

**2** We need not answer the question whether such a waiver could extend to gross negligence or recklessness on Nags Head's part or whether considerations of public policy would void the waiver in those circumstances, since gross negligence or recklessness has not been adequately demonstrated to survive summary judgment.

6

in <u>Krazek</u> provides useful guidance here. In that case a woman injured during a white-water rafting trip sued the rafting company. We held that a broad exculpatory clause that did not specifically mention the word "negligence" was sufficient to bar a claim for negligence:

> The second paragraph of the release, however, clearly waives Ms. Krazek's right to assert any claim of <u>any kind or nature whatsoever</u>. This language is obviously sufficient to waive a negligence action. To hold otherwise would create a requirement that to bar negligence claims all releases must include the words "negligence" or "negligent acts." We decline, however, to formulate a rule that requires the use of specific "magic words" in contracts such as this one.

<u>Krazek</u>, 884 F.2d at 166. The United States Supreme Court has similarly declined to hold that the express mention of the word "negligence" is necessary to limit liability for negligent acts, at least in a case regarding an indemnification contract between sophisticated parties. <u>See United States v. Seckinger</u>, 397 U.S. 203, 213 n.17 (1970) ("We specifically decline to hold that a clause that is intended to encompass indemnification for the indemnitee's negligence must include an `indemnify and hold harmless' clause or that it must explicitly state that indemnification extends to injuries occasioned by the indemnitee's negligence.").

Waggoner further has argued that because the waiver only applies to claims arising from her use of the watercraft, it does not bar this action which resulted from the defendant's negligence. Instead, she asserts that the clause was "clearly intended to apply to the Plaintiff's causing injury or property damage to third parties by virtue of <u>her</u> use of the craft." Brief of Appellant at 25. However, a waiver signed by Waggoner that limited <u>Nags Head's</u> liability for damages caused by <u>Waggoner</u> negligently injuring third parties would have no legal effect. Waggoner can only waive claims that she possesses, and she could only have any claims against Nags Head if <u>it</u> had been negligent, not if she were negligent.

Waggoner's argument that the waiver should not be construed to cover gross negligence or reckless conduct is on stronger ground --

7

courts have held that public policy forbids the avoidance of liability for gross negligence in these circumstances. But there is no genuine issue of gross negligence or recklessness in this case, since we may not consider the unsworn statements of her "experts." The failure properly to maintain the jet ski may have been negligent, but Waggoner has offered no evidence that it so far exceeded the bounds of proper care as to constitute gross negligence or recklessness.

In sum, the exculpatory clause, by its terms, bars Waggoner's suit.

C. <u>Public Policy Does Not Bar Enforcement</u>
<u>of the Exculpatory Clause</u>

Waggoner argues that the exculpatory clause should not be enforced because it violates the policies of admiralty law, North Carolina law, and general contract principles found in the Restatement. We disagree.

1. <u>Admiralty Principles</u>

Although Waggoner can point to no specific policy or statute of admiralty law that would render unenforceable the exculpatory clause that she signed, she argues that the Limitation of Liability Act, 46 U.S.C. App. §§ 181 - 196, "if not in its letter, in its spirit, would bar enforcement of the Defendant's exculpatory clause." Brief of Appellant at 36. The Limitation of Liability Act limits the liability of a vessel owner for property damage or injury due to collision or other accident at sea to the value of the vessel plus its cargo. 46 U.S.C. § 183(a). Section 183c of that Act prohibits a vessel owner from further limiting its liability for negligence when transporting passengers from port to port. That section provides:

> (a) Negligence
>
> It shall be unlawful for the manager, agent, master, or owner of any vessel <u>transporting passengers between ports of the United States or between any such port and a foreign port</u> to insert in any rule, regulation, contract, or agreement any provision or limitation (1) purporting, in the event of

> loss of life or bodily injury arising from the negligence or
> fault of such owner or his servants, to relieve such owner,
> master, or agent from liability, or from liability beyond any
> stipulated amount, for such loss or injury . . . . All such pro-
> visions or limitations contained in any such rule, regulation,
> contract, or agreement are declared to be against public pol-
> icy and shall be null and void and of no effect.

46 U.S.C. App. § 183c(a) (emphasis added).

Although the Act as a whole applies to pleasure craft, Richards v. Blake Builders Supply Inc., 528 F.2d 745, 748-49 (4th Cir. 1975), including jet skis, Keys Jet Ski, Inc. v. Kays , 893 F.2d 1225 passim (11th Cir. 1990), this section is limited by its terms to common carri-ers. The limitation reflects the principle that it is against public policy for a common carrier to attempt to limit its liability for its own negli-gence. See Santa Fe, Prescott & Phoenix Ry. Co. v. Grant Bros. Constr. Co., 228 U.S. 177, 184 (1913) ("It is the established doctrine of this court that common carriers cannot secure immunity from lia-bility for their negligence by any sort of stipulation."). This restriction on freedom of contract is justified by the need to "secure the utmost care in the rendering of a service of the highest importance to the community." Id. at 184-85. Furthermore, the Court "recognized that the carrier and the individual customer are not on an equal footing": in most cases the individual has no choice but to accept the terms offered by the carrier or forgo its essential service. Id. at 185.

That policy has no application where the defendant is not acting as a common carrier, however. See id. "In such a case, it is dealing with matters involving ordinary considerations of contractual relation; those who choose to enter into engagements with it are not at a disad-vantage; and its stipulations even against liability for its own neglect are not repugnant to the requirements of its public service." Id.; Kerr-McGee Corp. v. Law, 479 F.2d 61, 64 (4th Cir. 1973) (holding that parties to contract of private carriage were free under admiralty law "to make whatever contractual allocation of risk they desired").

Nags Head was not acting as a common carrier. It was not engaged in "transporting passengers between ports of the United States or between any such port and a foreign port." 46 U.S.C. App. § 183c. No

9

port has been mentioned, which suggests that support is lacking for Waggoner's argument. Rather it was providing recreational services, "which are not embraced within its duty as a common carrier although their performance may incidentally involve the actual transportation of persons and things, whose carriage in other circumstances might be within its public obligation." Santa Fe, Prescott & Phoenix Ry. Co., 228 U.S. at 185. The policy of admiralty law expressed in 46 U.S.C. App. § 183c, therefore, does not invalidate the exculpatory clause at issue.

2. North Carolina Law

It is unclear to what extent North Carolina law applies to this case. First, Nags Head asserts that Waggoner never pled any cause of action arising under North Carolina law, but rather relied exclusively on maritime law before the district court, and so may not raise issues of North Carolina law on this appeal. See Brief of Appellee at 4 n.1. However, Waggoner's complaint accused Nags Head of numerous acts of negligence, including negligence in hiring inexperienced employees in its rental business. Such negligence clearly sounds in North Carolina law, although it may sound in maritime law as well.

Furthermore, where maritime law applies, state law is often displaced. "[I]n several contexts, [the Supreme Court has] recognized that vindication of maritime policies demanded uniform adherence to a federal rule of decision, with no leeway for variation or supplementation by state law." Yamaha Motor Corp., U.S.A. v. Calhoun, 116 S. Ct. 619, 626 (1996). The requirement of uniformity is not absolute, however. See American Dredging Co. v. Miller, 510 U.S. 443, 451 (1994). "[I]t would be difficult, if not impossible, to define with exactness just how far the general maritime law may be changed, modified, or affected by state legislation." Id. (quoting Southern Pacific Co. v. Jensen, 244 U.S. 205, 216 (1917)) (internal quotation marks omitted) (alteration in original).

Luckily, in this case the same policies recognized by the maritime law are recognized in North Carolina law. "Under North Carolina law, parties are free to allocate the risk of injury by means of exculpatory contracts, unless the subject matter of such contracts affects a public interest." Bertotti v. Charlotte Motor Speedway, 893 F. Supp.

10

565, 566 (W.D.N.C. 1995). Although North Carolina courts assert that "[r]eleases which exculpate persons from liability for negligence are not favored by the law," Johnson v. Dunlap, 280 S.E.2d 759, 763 (N.C. Ct. App. 1981), except in specific circumstances they "recogniz[e] the right to contract against liability," Alston v. Monk, 373 S.E.2d 463, 466 (N.C. Ct. App. 1988).

North Carolina courts will enforce an exculpatory clause unless it is violative of a statute, gained through inequality of bargaining power, or contrary to a substantial public interest. See Andrews v. Fitzgerald, 823 F. Supp. 356, 378 (M.D.N.C. 1993); see generally Hall v. Sinclair Refining Co., 89 S.E.2d 396, 397-98 (N.C. 1955) (discussing the general rule that parties may contract to allocate the risk of their own negligence, and the circumstances under which such contracts will be held void). Although Waggoner asserts that the instant exculpatory clause falls within all three of these categories, she is mistaken.

First, Waggoner directs our attention to the North Carolina Boating Safety Act, N.C. Gen. Stat. § 75A-1 to -19 (1994). Although this statute explains that it is the policy of North Carolina to promote boating safety, its terms deal almost exclusively with the operation of water craft and do not address the duties owed by one who rents such craft for recreational use. The closest provision is section 75A-8, which provides that:

> It shall be unlawful for the owner of a boat livery to rent a vessel to any person unless the provisions of this Chapter have been complied with. It shall be the duty of owners of boat liveries to equip all vessels rented as required by this Chapter.

However, Waggoner does not assert that there has been any violation of this provision, nor do we find that there has been any such violation. Waggoner merely asserts that the statute as a whole exhibits a policy toward promoting boating safety. This is a far cry from a prohibition of exculpatory clauses in recreational rental agreements.

Waggoner further has asserted that she suffered from an inequality in bargaining power because the contract was an adhesion contract.

11

It is true that Waggoner could not negotiate the terms of the contract, but either had to sign the exculpatory clause or decline to rent the jet ski; however, this supposed "inequality of bargaining power . . . is more apparent than real. It is not different from that which exists in any other case in which a potential seller is the only supplier of the particular article or service desired." Gas House, Inc. v. Southern Bell Tel. and Tel. Co., 221 S.E.2d 499, 505 (N.C. 1976), overruled on other grounds, State ex rel. Utilities Comm'n v. Southern Bell Tel. and Tel. Co., 299 S.E.2d 763 (N.C. 1983). Only where "it is necessary for [the plaintiff] to enter into the contract to obtain something of importance to him which for all practical purposes is not obtainable elsewhere" will "unequal bargaining power" void an exculpatory clause. Hall, 89 S.E.2d at 398.

Waggoner has cited Hill v. Carolina Freight Carriers Corp., 71 S.E.2d 133 (N.C. 1952), for the proposition that a release "will never be so construed as to exempt the indemnitee from liability for his own negligence or the negligence of his employees in the absence of explicit language clearly indicating that such was the intent of the parties." Id. at 137. In that case the North Carolina Supreme Court held that an exculpatory clause purporting to cover "all losses" did not extend to losses caused by the negligence of the defendant, because it would be against public policy for a common carrier to be allowed to indemnify itself against its own negligence. Both North Carolina law and admiralty law recognize such a public policy regarding common carriers. However, Nags Head was not a common carrier and no similar public policy protects Waggoner from the plain language of her contract.

Finally, Waggoner has contended that the regulation of recreational boat rentals is infused with a public interest, and thus the exculpatory clause should be held invalid.**3** However, North Carolina courts have not held that recreational boat renting, as opposed to the services of

_____

**3** Waggoner has asserted that this clause is one for a public service because it is a bailment. The argument is meritless. Waggoner fails to appreciate the difference between a bailment and a lease, and in any case the rule regarding bailment only prohibits the limitation of liability of a bailee when entrusted with property of the bailor, whereas in this case Waggoner would have been the bailee and Nags Head the bailor.

12

a common carrier, is sufficiently important to justify such an imposition on the freedom of contract. As the Supreme Court of North Carolina has explained:

> The reason for the rule that a common carrier, or other public utility, may not contract away its liability for negligence in the performance of its public utility service and may not claim the benefit of an unreasonable contract limiting the amount of its liability therefor, is that every member of the public is entitled by law to demand such service with full liability at a reasonable rate therefor. For the company to refuse to serve unless the customer agrees to release it from liability for its negligent performance of its obligation to serve would be a denial of this legal right in the would-be customer. Thus, such a contract limiting the liability of the carrier, or other public utility, unless reasonable, is contrary to public policy and invalid. This limitation upon the right of the common carrier, or other public utility, to contract applies, however, only to its undertakings to render services which fall within its public service business.

Gas House, Inc., 221 S.E.2d at 505. See also Bertotti, 893 F. Supp. at 569 (explaining that the public interest exception only applies to heavily regulated industries such as medicine and cosmetology, not recreational go-kart racing).

3. Restatement (Second) of Contracts

The Restatement (Second) of Contracts does not suggest that the exculpatory clause at issue here should be invalidated. The relevant provision states, in pertinent part:

> (1) A term exempting a party from tort liability for harm caused intentionally or recklessly is unenforceable on grounds of public policy.
>
> (2) A term exempting a party from tort liability for harm caused negligently is unenforceable on grounds of public policy if

13

(a) the term exempts an employer from liability to an employee for injury in the course of his employment;

(b) the term exempts one charged with a duty of public service from liability to one to whom that duty is owed for compensation for breach of that duty, or

(c) the other party is similarly a member of a class protected against the class to which the first party belongs.

Restatement (Second) of Contracts § 195 (1979). There is no evidence in the record to support the assertion that Nags Head acted intentionally or recklessly, there is no employer/employee relationship, no "duty of public service" (as would be the case if Nags Head were a common carrier, see id. at § 195 cmt. a), and Waggoner is not a member of any class protected against recreational boat rental companies. This case instead falls within the Restatement's explanation that "a party to a contract can ordinarily exempt himself from liability for harm caused by his failure to observe the standard of reasonable care imposed by the law of negligence." Id.

III. CONCLUSION

Because Waggoner may not have demonstrated any admissible evidence of negligence sufficient to withstand Nags Head's summary judgment motion, and because, even if she had, her negligence claim would be barred by the exculpatory clause that she signed, the judgment of the district court is

AFFIRMED.

14